## EXHIBIT A

## Asset Purchase Agreement

33593100.11

**ASSET PURCHASE AGREEMENT**

**DATED AS OF [●], 2025**

**BY AND BETWEEN**

**DAVE CARTER & ASSOCIATES, INC.**

**AND**

**NORCOLD, LLC**

**[THIS DOCUMENT IS INTENDED SOLELY TO FACILITATE DISCUSSIONS BETWEEN THE PARTIES IDENTIFIED HEREIN. IT IS NOT INTENDED, AND WILL NOT BE DEEMED, TO CREATE A LEGALLY BINDING OR ENFORCEABLE OFFER OR AGREEMENT OF ANY TYPE OR NATURE PRIOR TO EXECUTION HEREOF BY ALL OF THE PARTIES HERETO.]**

**TABLE OF CONTENTS**

ARTICLE 1 DEFINITIONS ........................................................................................................................... 1

    1.1     Definitions ......................................................................................................................... 1
    1.2     Other Definitions and Interpretive Matters ................................................................... 14

ARTICLE 2 PURCHASE AND SALE ......................................................................................................... 15

    2.1     Purchase and Sale ............................................................................................................ 15
    2.2     Acquired Assets ............................................................................................................... 15
    2.3     Excluded Assets .............................................................................................................. 18
    2.4     Assumed Liabilities ........................................................................................................ 19
    2.5     Excluded Liabilities ........................................................................................................ 19
    2.6     Assignment and Assumption of Contracts ..................................................................... 20
    2.7     Wind-Down Budget ........................................................................................................ 22
    2.8     Further Assurances ......................................................................................................... 23
    2.9     Withholding .................................................................................................................... 23
    2.10    Payments Following Closing .......................................................................................... 23

ARTICLE 3 PURCHASE PRICE ............................................................................................................... 23

    3.1     Consideration .................................................................................................................. 24
    3.2     Limitation on Buyer Liability ........................................................................................ 24

ARTICLE 4 CLOSING AND DELIVERIES .............................................................................................. 24

    4.1     Closing Date .................................................................................................................... 24
    4.2     Buyer's Deliveries .......................................................................................................... 24
    4.3     Seller Deliveries ............................................................................................................. 26

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF SELLER ...................................................... 26

    5.1     Organization and Good Standing .................................................................................... 26
    5.2     Authority; Validity; Consents ........................................................................................ 26
    5.3     Subsidiaries .................................................................................................................... 27
    5.4     No Conflict ..................................................................................................................... 27
    5.5     Real Property .................................................................................................................. 27
    5.6     Title to Acquired Assets ................................................................................................. 28
    5.7     Compliance with Legal Requirements. .......................................................................... 28
    5.8     Labor Matters ................................................................................................................. 28
    5.9     Employee Benefits .......................................................................................................... 29
    5.10    Contracts ........................................................................................................................ 29
    5.11    Insurance ........................................................................................................................ 30
    5.12    "AS IS" Transaction. ...................................................................................................... 30

ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF BUYER ....................................................... 30

    6.1     Organization and Good Standing .................................................................................... 30
    6.2     Authority; Validity; Consents ........................................................................................ 30
    6.3     No Conflict ..................................................................................................................... 31
    6.4     Litigation ........................................................................................................................ 31
    6.5     Brokers or Finders .......................................................................................................... 31

6.6 "AS IS" Transaction ..................................................................................................31

**ARTICLE 7 ACTIONS PRIOR TO THE CLOSING DATE** ..................................................**32**

7.1 Access and Reports ...............................................................................................32
7.2 Operations Prior to the Closing Date .....................................................................33
7.3 Governmental Approvals; Cooperation ...................................................................35
7.4 Bankruptcy Court Matters ......................................................................................36
7.5 Notice of Developments .........................................................................................37
7.6 Transition of Business. ...........................................................................................37
7.7 Sale Free and Clear ...............................................................................................37

**ARTICLE 8 ADDITIONAL AGREEMENTS** ........................................................................**38**

8.1 Taxes .....................................................................................................................38
8.2 Payments Received ................................................................................................38
8.3 Assigned Contracts: Adequate Assurance and Performance ................................38
8.4 Post-Closing Books and Records and Personnel ..................................................38
8.5 Casualty Loss ........................................................................................................39
8.6 Name Change ........................................................................................................39
8.7 No Successor Liability ............................................................................................39

**ARTICLE 9 CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE** ...........**40**

9.1 Accuracy of Representations ..................................................................................40
9.2 Seller's Performance ..............................................................................................40
9.3 No Order .................................................................................................................40
9.4 Governmental Authorizations; Consents ................................................................40
9.5 Seller's Deliveries ..................................................................................................40
9.6 Sale Order ..............................................................................................................40
9.7 Assigned Contracts ................................................................................................40
9.8 Material Adverse Effect ..........................................................................................40
9.9 Event of Default .....................................................................................................41
9.10 Releases and Termination Statements ...................................................................41
9.11 Confirmation Order .................................................................................................41

**ARTICLE 10 CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE** ...........**41**

10.1 Accuracy of Representations ..................................................................................41
10.2 Sale Order in Effect ...............................................................................................41
10.3 Buyer's Performance ..............................................................................................41
10.4 No Order .................................................................................................................42
10.5 Buyer's Deliveries ..................................................................................................42

**ARTICLE 11 TERMINATION** .........................................................................................**42**

11.1 Termination Events .................................................................................................42
11.2 Effect of Termination ..............................................................................................44

**ARTICLE 12 GENERAL PROVISIONS** ...........................................................................**44**

12.1 Survival ..................................................................................................................44
12.2 Confidentiality ........................................................................................................44
12.3 Public Announcements ...........................................................................................44
12.4 Notices ...................................................................................................................44

| | | |
|---|---|---|
| 12.5 | Waiver | 45 |
| 12.6 | Entire Agreement; Amendment | 46 |
| 12.7 | Assignment | 46 |
| 12.8 | Severability | 46 |
| 12.9 | Expenses | 46 |
| 12.10 | Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver | 46 |
| 12.11 | Counterparts | 47 |
| 12.12 | Parties in Interest; No Third Party Beneficiaries; No Amendment | 47 |
| 12.13 | Remedies | 47 |
| 12.14 | Specific Performance for Post-Closing Covenants | 47 |
| 12.15 | No Exemplary, Special, Punitive Damages | 48 |
| 12.16 | Non-Recourse | 48 |
| 12.17 | Release | 48 |

**EXHIBITS**

Exhibit A          Form of Assignment and Assumption Agreement
Exhibit B          Bidding Procedures
Exhibit C          Bidding Procedures Order
Exhibit D          Form of Bill of Sale
Exhibit E          Form of Joinder
Exhibit F          Disclosure Schedules

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of [●], 2025 (the "Execution Date"), is made and entered into by and between Dave Carter & Associates, Inc., a Florida corporation ("Buyer") and Norcold, LLC, a Delaware limited liability company ("Seller").

### RECITALS

**WHEREAS**, Seller is engaged in the business of developing, designing, assembling, inspecting, testing, labeling, selling and distributing gas absorption refrigerators and cooling units to original manufacturers and distributors for installation in recreational vehicles and boats throughout the United States (such business of Seller, including any other business currently conducted or proposed to be conducted by Seller, the "Business");

**WHEREAS**, on [●], 2025 (the "Petition Date"), Seller commenced a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the [●] (the "Bankruptcy Court"), under Case No. [●] (the "Bankruptcy Case");

**WHEREAS**, in accordance with the Bidding Procedures and subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order, Seller desires to sell to Buyer, all of the Acquired Assets, and Buyer desires to purchase from Seller all of the Acquired Assets, and Seller desires to assign, and Buyer desires to assume, all of the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated by this Agreement (the "Transactions"), upon the terms and conditions hereinafter set forth;

**WHEREAS**, the Acquired Assets and the Assumed Liabilities shall be purchased and assumed by Buyer, pursuant to the Sale Order, free and clear of any and all Liens (other than Assumed Liens), pursuant to §§ 105, 363 and 365 of the Bankruptcy Code, and Rules 4001, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure; and

**WHEREAS**, Seller's ability to consummate the Transactions is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

## ARTICLE 1
### DEFINITIONS

1.1    Definitions.

For purposes of this Agreement, the following terms have the meaning specified or referenced below.

"Accounts Payable" means, with respect to the Seller, all obligations for the payment of money, including trade payables, accrued expenses (exclusive of any litigation and product liability reserves), and other amounts due and owing to any third party or to any Affiliate, whether or not invoiced, arising out of or in connection with the conduct of the Business, including

payables in respect of goods or services received, intercompany account balances, employee-related liabilities, and other similar obligations.

"Accounts Receivable" means, with respect to Seller, all accounts receivable, notes receivable, purchase orders, negotiable instruments, completed work or services that have not been billed, chattel paper, notes and other rights to payment, including (a) those consisting of all accounts receivable in respect of services rendered or products sold by Seller, any other miscellaneous accounts receivable of Seller, and any claim, remedy or other right of Seller related to any of the foregoing, together with all unpaid financing charges accrued thereon and any payments with respect thereto, and (b) all accounts and accounts receivable of Seller existing at the Closing Date arising out of the operation of the Business and all rights to bill and receive payment (including all accounts and accounts receivable that have been "written off" or charged against or to any bad debt reserve of Seller), and any security held by Seller for the payment thereof, in each case.

"Action" means any legal action, suit, petition, plea, charge, claim, demand, arbitration, audit, complaint, grievance, summons, litigation, mediation, suit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Affiliate" has the meaning set forth in 11 U.S.C. § 101(2).

"Approved Budget" has the meaning set forth in the DIP Order.

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement in substantially the form attached hereto as **Exhibit A**, with any modifications thereto to be acceptable to each of Seller and Buyer.

"Assumed Liens" means (i) Liens for Taxes not yet delinquent or that are being contested in good faith by appropriate proceedings and arising or incurred in the Ordinary Course of Business; (ii) mechanic's, workmen's, repairmen's, warehousemen's, carrier's, or other similar Liens, including all statutory liens, arising, or incurred in the Ordinary Course of Business for amounts that are not delinquent and that are not, individually or in the aggregate, material to the business of Seller; (iii) with respect to leased or licensed real or personal property, the terms and conditions of the lease, license, sublease, or other occupancy agreement applicable thereto that are customary; (iv) with respect to any leased real property, usual, and customary zoning, building codes, and other land use laws regulating the use or occupancy of such leased real property or the activities conducted thereon that are imposed by any Governmental Authority having jurisdiction over such leased real property; and (v) all Liens specifically set forth on Section 1.1(a)(i) of the Disclosure Schedules.

"Assumed Taxes" means only (a) Washington state excise taxes arising from the operation of the Business and attributable to Pre-Closing Tax Periods to the extent set forth on Section 2.4(f) of the Disclosure Schedules, (b) customs duties and tariffs arising from the importation of goods for the Business and attributable to Pre-Closing Tax Periods, in each case solely to the extent not included in the Wind-Down Budget, and (c) taxes set forth on Section 1.1(a)(ii) of the Disclosure Schedules.

"Avoidance Action" means any claim, right or cause of action of Seller arising under chapter 5 of the Bankruptcy Code (including sections 544, 545, 547, 548, 549, 550 and 553) and any analogous state law claims relating to the Acquired Assets or the Business.

"Backup Bidder" has the meaning set forth in the Bidding Procedures.

"Benefit Plan" means (a) any "employee benefit plan" within the meaning of Section 3(3) of ERISA, and (b) any other compensation or benefit plan, program, practice, arrangement or agreement, whether or not subject to ERISA, whether or not reduced to writing, and whether covering a single individual or group of individuals, including, but not limited to, any bonus, commission, employment, consulting, equity or equity-based, incentive compensation profit-sharing, deferred compensation, employee loan, life insurance, pension, retirement, supplemental retirement, tax gross-up, expense reimbursement, medical, hospital, disability, "cafeteria" or "flexible" benefit, welfare or fringe benefit, change of control, transaction, severance or retention, post-termination or post-employment health and welfare, salary continuation, paid time-off, or other compensation or benefit policy, practice, program, plan, contract, agreement or arrangement, in each case, (i) under which any current or former employee or service provider (or any of their respective beneficiaries) has any present or future right to benefits, and (ii) with respect to which Seller sponsors, maintains or contributes to, or has any obligation to maintain or contribute to, or has or could reasonably be expected to have any Liability.

"Bidding Procedures" means those certain bidding procedures substantially in the form attached hereto as **Exhibit B**, to be approved by the Bankruptcy Court pursuant to the Bidding Procedures Order, with any modifications thereto to be acceptable to each of Seller and Buyer.

"Bidding Procedures Order" means that certain Order of the Bankruptcy Court substantially in the form attached hereto as **Exhibit C**, with any modifications thereto to be acceptable to Buyer.

"Bill of Sale" means the Bill of Sale substantially in the form attached hereto as **Exhibit D**, with any modifications thereto to be acceptable to each of Seller and Buyer.

"Business Day" means any day of the year on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized to close.

"Cash" means all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and marketable securities, and any bank accounts, lockbox arrangements, cash in transit (including uncleared checks, ACH payments, and wire transfers) and other liquid investments of Seller as of the Closing. For the avoidance of doubt, any Cash that is an "Excluded Asset" pursuant to this Agreement shall remain subject to all Liens.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, against Seller.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any agreement, contract, obligation, promise, undertaking, lease (including Leases and Lessor Leases), sublease, purchase order, arrangement, license,

3

commitment, insurance policy or other binding arrangement or understanding (in each case, whether written or oral), and any amendments, modifications or supplements thereto.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan.

"Copyrights" means all United States and foreign copyright rights in any original works of authorship, whether registered or unregistered, including all copyright registrations and applications.

"Credit Bid" means a bid made pursuant to section 363(k) of the Bankruptcy Code using some or all of the outstanding obligations under the DIP Term Sheet.

"Cure Costs" means all monetary liabilities as of the effective date of Seller's assignment of a Contract to Buyer, including pre-petition monetary liabilities, of Seller that must be paid or otherwise satisfied to cure all of Seller's monetary defaults under the Assigned Contracts pursuant to section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court.

"DIP Financing" means the senior secured superpriority debtor-in-possession financing provided to Seller pursuant to the DIP Term Sheet, as approved by the DIP Order, including all loans, advances, obligations, fees, interest, expenses and other amounts thereunder, and any amendments, restatements, supplements, modifications, renewals, replacements, refinancings or refundings thereof.

"DIP Term Sheet" means that certain Senior Secured Superpriority Debtor-in-Possession Term Loan Facility Term Sheet, dated as of [●], by and among Seller and the lenders from time to time party thereto, as the same may be amended, restated, supplemented or otherwise modified, together with all annexes, exhibits and schedules thereto.

"DIP Order" means the interim order and the final order entered by the Bankruptcy Court approving, among other things, Seller's entry into the DIP Term Sheet and the DIP Facility (as defined in the DIP Order).

"Disclosure Schedules" means the Disclosure Schedules attached hereto, dated as of the Execution Date, delivered by Seller to Buyer in connection with the execution of this Agreement.

"Documents" means all of the documents of, generated by, used in, or held for use in the operation of the Business as conducted by Seller.

"Effective Time" means 12:01 a.m. prevailing Eastern Time on the Closing Date.

"Employee Retention Credit" means an estimated amount of approximately $1,300,000.00, including all rights to claim, receive, or enforce payment thereof.

"Environmental Laws" means any and all Legal Requirements concerning or relating to public health and safety, the protection of worker or occupational health from exposure to Hazardous Substances and employee safety in the workplace, and pollution or protection of the environment, including those relating to the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, storage, disposal, distribution,

4

importing, labeling, testing, processing, discharge, Release, threatened Release, control, cleanup, or other action or failure to act involving Hazardous Substances.

"Equipment" means all furniture, fixtures, equipment, scaffolding and related materials, computers, machinery, tools, molds, vehicles, apparatus, appliances, implements, telephone systems, management information systems (including all software and hardware related thereto), signage, supplies and all other tangible personal property of every kind and description, and improvements and tooling of, used in, or held for use in, the operation of the Business as conducted by Seller, wherever located, including communications equipment, information technology assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents, and including all warranties of the vendor applicable thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Estimated Wind-Down Expenses" means the out-of-pocket administrative costs and expenses to be funded by Seller or its Affiliates and which Seller expects to incur in connection with winding down its bankruptcy estate after the Closing Date (whether incurred prior to, at or following Closing), as, and solely to the extent, set forth in the Wind-Down Budget as mutually agreed and as may be adjusted pursuant to Section 2.7; provided, however, that such Estimated Wind-Down Expenses shall include: (i) all disbursements in the Approved Budget that have not been disbursed as of the date of approval of the Wind-Down Budget; (ii) all prepetition claims entitled to priority under section 507(a) of the Bankruptcy Code; and (iii) the amounts in the Professional Fees Escrow (as defined in the DIP Order) on the Closing Date. For the avoidance of doubt, to the extent a cost or expense would fall into multiple of the foregoing categories, it will only be included once in the calculation of the Estimated Wind-Down Expenses.

"Event of Default" has the meaning set forth in the DIP Term Sheet.

"Excess Cash" means all Cash of the Seller or its bankruptcy estate remaining as of the date that is seventy-five (75) days after the Closing Date, after giving effect to (i) the payment or reservation of all Cure Costs, Estimated Wind-Down Expenses, and other expenses permitted or required to be paid by the Seller or its bankruptcy estate pursuant to the Sale Order or otherwise in connection with the Bankruptcy Case, and (ii) the establishment of a reasonable reserve for any remaining wind-down or professional expenses as determined in accordance with Section 2.7(b).

"Excluded Causes of Action" means any and all Actions, claims, causes of action, rights, counterclaims, defenses or assertions against, of, by or on behalf of Seller, whether known or unknown, choate or inchoate, foreseen or unforeseen, contingent or fixed, in law or in equity, arising out of, relating to, or in connection with any act, omission, event, circumstance, condition, product, practice, service, or other conduct occurring, arising, or alleged to have occurred or arisen prior to the Closing Date, including for the avoidance of doubt any such Actions or claims that are asserted under, arise under, or are brought pursuant to any Assigned Contract to the extent based on pre-Closing Date facts, events, or conduct, and including those relating to the matters set forth on Section 1.1(b) of the Disclosure Schedules.

"Final Order" means an Action taken or Order issued by the applicable Governmental Authority as to which: (a) no request for stay of the Action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or

5

regulation, it is passed, including any extensions thereof; (b) no petition for rehearing or reconsideration of the Action or Order, or protest of any kind, is pending before the Governmental Authority, and the time for filing any such petition or protest is passed; (c) the Governmental Authority does not have the Action or Order under reconsideration or review on its own motion, and the time for such reconsideration or review has passed; and (d) the Action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Code, may be filed relating to such order, shall not cause such order not to be a Final Order.

"GAAP" means generally accepted accounting principles in the United States.

"Governmental Authority" means any United States federal, state or local or any foreign government, governmental authority or regulatory or administrative authority, agency or commission or any court, tribunal or judicial body having jurisdiction, including the Bankruptcy Court, or any mediator, arbitrator or arbitral body.

"Governmental Authorization" means any approval, consent, license, Permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"Hazardous Substance" means any substance, material or waste (including chemicals, compounds, mixtures, pollutants and contaminants) which is regulated because of its effect or potential effect on public health or the environment, including (a) any substance, material or waste which is defined as a "pollutant", "contaminant", "hazardous waste", "hazardous material" or "hazardous substance" under any Environmental Law; (b) petroleum or any fraction thereof, or petroleum products, (c) natural gas, (d) asbestos and asbestos-containing materials, (e) radioactive material, (f) urea formaldehyde, and (g) polychlorinated biphenyls.

"Improvements" means the buildings, structures, systems, facilities and improvements located on the Real Property.

"Indebtedness" means, at any time and with respect to any Person, all: (a) indebtedness of such Person for borrowed money; (b) indebtedness of such Person for the deferred purchase price of property or services (other than trade payables, other expense accruals and deferred compensation items arising in the Ordinary Course of Business); (c) obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the Ordinary Course of Business in respect of which such Person's liability remains contingent); (d) indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (e) obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as finance leases, to the extent required to be so recorded; (f) reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities (but only to the extent drawn); (g) vendor financing arrangements; (h) obligations of such Person under interest rate or currency swap transactions or commodity hedges (valued at the termination value thereof); (i) Indebtedness of others referred to in clauses (a) through (h) above guaranteed directly or indirectly by such Person, or in effect

guaranteed directly or indirectly by such Person, through an agreement (i) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness, (ii) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered), or (iii) otherwise to assure a creditor against loss in respect of such Indebtedness; and (j) Indebtedness referred to in clauses (a) through (i) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Intellectual Property" means all intellectual property rights, including all Trademarks, service marks, trade names, mask works, inventions, Patents, Trade Secrets, Copyrights, know-how or any other similar type of proprietary intellectual property right and all applications for, and registrations of, any of the foregoing, in each case, owned, used or licensed by Seller and used in, held for use in, or necessary for the operation of the Business or the Acquired Assets.

"IRS" means the United States Internal Revenue Service.

"Joinder" means a joinder substantially in the form attached hereto as **Exhibit E**.

"Klein Settlement Amount" means an estimated amount of $100,000, including all rights to claim, receive, or enforce payment thereof.

"Knowledge" means, with respect to any matter in question, in the case of Seller, the actual knowledge, as of the Execution Date, of the Richard Wu, the Chief Restructuring Officer of Seller.

"Leased Real Property" means the real property and Improvements let, leased or subleased by Seller, as tenant, subtenant, lessee or sublessee, or in which Seller has been granted a possessory interest or right to use or occupy all or any portion of the same, in each case, which is subject to a written lease to which Seller is a party, which is used in or held for use in the operation of the Business as conducted by Sellers or on which any Improvements that constitute Acquired Assets are located (each such real property lease a "Lease", and collectively, the "Leases").

"Legal Requirement" or "Law" means any federal, state, local or foreign law, constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated or applied by a Governmental Authority.

"Liability" means any liabilities, Liens or obligations of any kind or nature whatsoever (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability or otherwise), including all costs and expenses relating thereto (including all fees, disbursements and expenses of legal counsel, experts, engineers and consultants and costs of investigation).

"Lien" means any "interest" as that term is used in section 363(f) of the Bankruptcy Code, mortgage, deed of trust, pledge, assignment, security interest, encumbrance, lien, mechanics lien, charge, hypothecation, deemed trust, action, easement, charge or otherwise, or claim of any

7

kind or nature whatsoever in respect of any property, including any of the foregoing created by, arising under, or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a finance lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of a financing statement naming the owner of the property as to which such lien relates as the debtor under the Uniform Commercial Code or any comparable Legal Requirement in any other jurisdiction.

"Material Adverse Effect" means any change, effect, event, state of facts, development or occurrence that, individually or in the aggregate (taking into account all other such changes, events, state of facts or occurrences), has had, or would be reasonably expected to have, a material adverse change in or material adverse effect on (a) the Acquired Assets, taken as a whole, or the assets, properties, financial conditions or results of operations of the Business, taken as a whole, or (b) the ability of Seller to consummate the Transactions or to perform any of their obligations under this Agreement, but, with respect to clause (a), excluding any change or effect to the extent that it results from or arises, following the Execution Date, out of (i) the commencement of the Bankruptcy Case or operations of Seller as a debtor and debtor-in-possession; (ii) any global, national, international, foreign, domestic or regional economic, financial, social, military, political or business conditions (including changes therein) or events in general, including the results of any primary or general elections, the appointment, resignation, or removal of any Person or persons at any Governmental Authority, hostilities, acts of war, sabotage or terrorism or military actions or any escalation, worsening or diminution of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway; (iii) any changes in any financial, credit, debt, capital or banking markets or conditions (including any disruptions thereof), in each case, in the United States of America or anywhere else in the world; (iv) any changes in interest, currency or exchange rates or the price of any commodity, security or market index; (v) any changes in applicable Legal Requirements, GAAP or other accounting principles or requirements, or standards, interpretations or enforcement thereof (including the effect of the implementation of ASC 842); (vi) changes that are the result of factors generally affecting the industries in which the Business operates; (vii) any failure of Seller to meet, any internal or public projections, forecasts, budgets or estimates of or relating to the Business for any period prior to the Closing, including with respect to revenue, earnings, cash flow or cash position (provided that this clause (vii) shall not preclude any change, effect, event, occurrence, state of facts or development that may have contributed to or caused such failures and is not otherwise excluded from this definition of "Material Adverse Effect" from being taken into account in determining whether a Material Adverse Effect has occurred); (viii) any stoppage or shutdown of any Governmental Authority; (ix) earthquakes, floods, tornadoes, food-borne illness, pandemics (including with respect to COVID-19), avalanches, tsunamis, blizzards, hurricanes, tropical storms, mudslides, fires or other natural disasters or any national, international or regional calamity or any man-made disaster and other force majeure events in the United States of America or any other country or region in the world; (x) the imposition of new tariffs or increases in the rate of existing tariffs, or (xi) the taking of any action expressly required by this Agreement or any other Transaction Document; provided, however, that in the case of the foregoing clauses, such effects, changes, conditions, circumstances, developments or events shall be taken into account in determining whether any material adverse effect or material adverse change has occurred solely to the extent that any such effects, changes, conditions, circumstances, developments or events have had, or are reasonably expected to have, a disproportionate effect on the Business (excluding the

Excluded Assets and the Excluded Liabilities) or the Acquired Assets relative to other participants operating in the industries in which Seller operates.

"Material Contract" means any material Contract of the Business, including any Contract to which Seller is a party or bound or otherwise of or related to the Business that constitutes: (a) a Contract for a joint venture, strategic alliance, partnership, licensing arrangement, franchise agreement, or sharing of profits of the Business; (b) a Contract relating to any pending or consummated acquisition of all or a substantial portion of the equity securities, assets or business of any Person where Seller has any continuing contractual obligations; (c) a Contract with respect to Real Property, including any Lessor Leases; (d) a Contract under which Seller is lessee of, or holds or operates, any personal property owned by any other Person, for which the annual rental rate exceeds $50,000; (e) a Contract under which Seller is lessor of or permits any third party to hold or operate any property, real or personal of Seller, for which the annual rental rate exceeds $50,000; (f) a license of Intellectual Property (except an Intellectual Property license implied by the sale of goods, or pursuant to which Seller licenses software generally commercially available with a replacement cost or total annual license and maintenances fees of less than $50,000); (g) a Contract with a customer of the Business which resulted in, or is reasonably expected to result in, aggregate annual payments to Seller in excess of $50,000 or obligates the customer to make aggregate payments to Seller of more than $50,000 over the remaining stated term of such Contract (including any renewal or extension that may be effected at a counterparty's option); (h) a Contract limiting the right of the Business or Seller to (A) engage in or compete with any Person in any business or in any geographical area, or (B) solicit or hire any Person or customers with respect to the Business (other than pursuant to any restriction imposed by any applicable Legal Requirement or Permit); (i) a Contract that is a settlement or similar agreement pursuant to which Seller is obligated to pay consideration after the Execution Date in excess of $50,000; (j) a Contract or group of related Contracts with the same party or its Affiliates pursuant to which consideration in excess of $50,000 is paid or payable; (k) a Contract evidencing Indebtedness in excess of $50,000; (l) a Collective Bargaining Agreement; or (m) a Contract that contains any indemnification, hold harmless, defense, contribution, or reimbursement obligation of the Seller in favor of any distributor, dealer, reseller, sales representative, agent, customer, end user, original equipment manufacturer, component supplier, logistics provider, or other Person involved in the Seller's distribution, sales, or supply chain (including obligations relating to product liability, warranty, recall, retrofit, repair, replacement, refunds, credits, chargebacks, safety notices, intellectual property infringement, or compliance with Law).

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA.

"Order" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, mandate, precept, command, directive, decree or similar determination or finding entered, issued, made or rendered by any Governmental Authority, or any arbitrator, mediator, or other quasi-judicial or judicially sanctioned Person or body.

"Ordinary Course of Business" means, with respect to any Person, the ordinary and usual course of normal day to day operations of such Person and its business, consistent with its past practices during the period immediately preceding the Execution Date, in each case taking into consideration Seller's recent financial distress, insolvency, bankruptcy, or restructuring activities or efforts, including any material changes to operational practices, vendor or supplier

9

relationships, payment terms, credit policies, inventory management, or cash management practices, resulting from or influenced by such financial distress.

"Other Rights" means easements, rights of way, privileges, licenses, hereditaments, appurtenances and all other rights and benefits appurtenant or in any way related to, or demised under any lease of or other contact or agreement for the use of, the Leased Real Property.

"Parent" means Thetford LLC, a Delaware liability company.

"Party" or "Parties" means, individually or collectively, Buyer, Seller and any Buyer Designee that becomes party hereto pursuant to a Joinder.

"Patents" means United States and foreign patents and patent applications, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals and patent disclosures related thereto.

"Permits" means all approvals, permits, licenses, franchises, waivers, filings, consents, certificates, notices, qualifications, authorizations, registrations, clearances and Orders, together with all modifications, amendments, supplements and extensions thereof, of or from any Governmental Authority or any other Person that are necessary for Seller to own the Acquired Assets or operate the Business.

"Permitted Liens" means any: (a) easements, rights of way, restrictive covenants, encroachments and similar non-monetary Liens or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, materially or adversely affect the operation of the Business; (b) applicable zoning, building and Environmental Laws, ordinances, codes, restrictions and regulations; (c) materialmen's, mechanics', artisans', shippers', warehouseman's or other similar common law or statutory liens incurred in the Ordinary Course of Business for sums not yet due and payable or that are due but may not be paid as a result of the commencement of the Bankruptcy Case; (d) statutory liens for current Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which are being contested in good faith and for which adequate reserves have been established in accordance with GAAP on the Financial Statements; (e) rights granted to any licensee of any Intellectual Property of Seller in the Ordinary Course of Business; (f) Liens that will be and are discharged or released either prior to, or simultaneously with the Closing; (g) such other Liens, title exceptions or imperfections of title as Buyer may approve in writing in its sole discretion; and (h) other Liens specifically set forth on Section 1.1(a)(iii) of the Disclosure Schedules.

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or Governmental Authority.

"Plan" means the Chapter 11 Plan filed at Docket No. [●].

"Post-Closing COBRA Liabilities" means the continuation coverage requirements of COBRA arising on or following the Closing Date for all individuals who are M&A qualified beneficiaries (as such term is defined in Treasury Regulation Section 54.4980B-9, Q&A-4(a)).

"Pre-Closing Tax Period" means any Tax period or year, or portion thereof, that ends on or before the Closing Date.

"Pre-Closing Taxes" means any all Liabilities with respect to Taxes imposed on the Business or the Acquired Assets that are attributable to any Pre-Closing Tax Period.

"Pre-Paid Expenses" means all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, pre-paid expenses, prepayments, vendor rebates and other refunds, claims, causes of action, rights of recovery, rights under warranties and guaranties, rights of set off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), in each case, excluding any deposits or prepayments of Pre-Closing Taxes including, for the avoidance of doubt, any rights to payment, refund or credit in respect of the Employee Retention Credit or similar Tax credit or incentive, whether or not received as of the Closing Date.

"Pre-Petition Debt Documents" means any prepetition credit, loan, indenture, note purchase, or similar agreements of Seller, including any guarantees thereof by Seller and Buyer, as identified on Schedule 1.1(c)).

"Qualified Bid" has the meaning set forth in the Bidding Procedures.

"Qualified Bidder" has the meaning set forth in the Bidding Procedures.

"Real Property" means: (a) the Leased Real Property; (b) all strips and gores and any land lying in the bed of any public road, highway or other access way, open or proposed, adjoining such real property to the extent that Seller has a legally recognized interest therein; and (c) all Other Rights.

"Release" means (a) any releasing, spilling, discharging, disposing, leaking, pumping, injecting, pouring, depositing, dispersing, emitting, leaching or migrating into the indoor or outdoor environment, including ambient air, surface water, groundwater and surface or subsurface strata, or into or out of any property, including the movement of Hazardous Substances through or in the air, soil, surface water, groundwater, surface or subsurface strata or property, but excludes (i) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel or pipeline pumping station engine, and (ii) the normal and appropriate application of fertilizer, and (b) the abandonment or discarding of barrels, tanks, containers or receptacles, whether or not sealed or closed, containing, or which formerly contained, Hazardous Substances.

"Representative" means, with respect to a particular Person, any director, officer, manager, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Sale Hearing" means the hearing to consider the entry of the Sale Order.

"Sale Order" means an Order of the Bankruptcy Court, in form and substance satisfactory to Buyer, pursuant to, *inter alia*, sections 105, 363, and 365 of the Bankruptcy Code authorizing and approving, *inter alia*, the sale of the Acquired Assets to Buyer, on the terms and conditions set forth herein, free and clear of any and all Liens (other than Assumed Liens) and Claims, and the assumption and assignment of the Assigned Contracts to Buyer, and containing findings of fact and conclusions of law that Buyer and its Affiliates have acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code and are not successors to Seller.

"Stalking Horse Agreement" has the meaning set forth in the Bidding Procedures.

"Stalking Horse Purchaser" has the meaning set forth in the Bidding Procedures.

"Subsidiary" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body.

11

"Successful Bidder" has the meaning set forth in the Bidding Procedures.

"Tax" or "Taxes" means any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental, natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto whether disputed or not), in each case, in the nature of a tax.

"Tax Refund" means any Tax refund (including any interest paid with respect thereto) that is actually realized in cash and relates to any Taxes paid by Seller in any Tax period.

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Trade Payables" means Accounts Payable obligations of Seller incurred at any time, solely to the extent that such obligations (a) relate to the Acquired Assets, and (b) will not be payable by Buyer following the Closing pursuant to any Assigned Contract or Cure Costs.

"Trade Secrets" means trade secrets and other confidential and proprietary information and know-how.

"Trademarks" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress and trade names, Internet domain names and any other similar designations of source of goods or services, whether registered or unregistered, and registrations and pending applications to register the foregoing, and all goodwill related to or symbolized by the foregoing.

"Transaction Documents" means this Agreement, the Assignment and Assumption Agreement, the Bill of Sale and any other agreements, instruments, certification, or documents entered into pursuant to this Agreement.

"Transfer Tax" means all transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the Transactions that are not exempted under (a) applicable Legal Requirements, or (b) to the extent permitted by applicable Legal Requirements, the Sale Order.

"Transferable Insurance Policies" means any insurance policy of or for the benefit of Seller or the Business (a) which is transferable or assignable as an Acquired Asset pursuant to its terms or, notwithstanding its terms, is transferable or assignable as an Acquired Asset pursuant to the Sale Order, or (b) if not so transferable or assignable, the applicable counterparty has otherwise consented to the transfer or assignment as an Acquired Asset pursuant to the terms of this Agreement and, in each case, excluding any insurance policy providing for the payment of any benefits with respect to, or securing any Liabilities with respect to, any Benefit Plans;

12

provided, however, that any (i) D&O policy in effect as of the Execution Date, including any tail policy as in effect and (ii) policies providing products liability occurrence based or similar coverage (other than as it relates to the Warranty Claims) shall not, in each case, be considered Transferable Insurance Policies.

"USPTO" means the United States Patent and Trademark Office, or any successor agency or office thereto.

"Warranty Claims" means claims by end-customers or distributors arising from written product warranties covering units sold prior to the Petition Date, solely to the extent such claim amount is equal to the value of a refrigerator or less, determined in accordance with Seller's prepetition warranty policies as in effect on or prior to the Petition Date, and net of any applicable credits, recoveries or insurance to the extent actually received by Buyer following the Closing Date.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar state or local Legal Requirement and the rules and regulations thereunder.

"Wind-Down Budget" means that certain budget providing for payment in full of the Estimated Wind-Down Expenses, which, pursuant to Section 2.7, shall otherwise be mutually agreed upon by Seller and Buyer prior to the Closing Date.

| **Additional Terms** | **Section** |
|---|---|
| "Acquired Assets" | Section 2.2 |
| "Agreement" | Preamble |
| "Assigned Contracts" | Section 2.6(a)(i) |
| "Assumed Liabilities" | Section 2.4 |
| "Auction" | Section 2.2(q) |
| "Bankruptcy Case" | Recitals |
| "Bankruptcy Code" | Recitals |
| "Bankruptcy Court" | Recitals |
| "Business" | Recitals |
| "Buyer" | Preamble |
| "Buyer Designee" | Section 4.2(b) |
| "Closing Date" | Section 4.1 |
| "Collective Bargaining Agreement" | Section 5.8(b) |
| "Excluded Assets" | Section 2.3 |
| "Excluded Cash" | Section 2.3(i) |
| "Excluded Insurance Policies" | Section 2.3(e) |
| "Excluded Liabilities" | Section 2.5 |
| "Execution Date" | Preamble |
| "Execution Date Contract Schedule" | Section 2.6(a)(i) |
| "Inventory" | Section 2.2(a) |
| "Lessor Leases" | Section 5.5(b) |
| "Outside Date" | Section 11.1(b) |
| "Petition Date" | Recitals |
| "Previously Omitted Contract" | Section 2.6(b) |

"Previously Omitted Contract Notice" ............................................................Section 2.6(b)
"Purchase Price" ..............................................................................................Section 3.1(a)
"Rejected Contract" .........................................................................................Section 2.6(b)
"Released Buyer Parties" ...............................................................................Section 12.17(a)
"Releasing Seller Parties" ..............................................................................Section 12.17(a)
"Seller" ...............................................................................................................Preamble
"Transferred Permit Fees" ...............................................................................Section 7.3(b)
"Transferred Permits" ......................................................................................Section 2.2(e)
"Union(s)" ........................................................................................................Section 5.8(b)

1.2     Other Definitions and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day;

(ii)     any reference in this Agreement to days (but not Business Days) means to calendar days;

(iii)     any reference to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided;

(iv)     all Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein, and any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement;

(v)     any reference in this Agreement to gender includes all genders, and words imparting the singular number only include the plural and vice versa;

(vi)     the provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement;

(vii)     all references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified;

(viii)     words such as "herein", "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires;

(ix)     the word "including" or any variation thereof means without limitation and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it;

(x)     the word "and/or" means and includes "or";

14

(xi)    the words "earned" and "incurred" shall be interpreted in accordance with GAAP standards; and

(xii)    capitalized terms used herein shall have the meanings ascribed to them in this Agreement as such terms are identified or defined in the definitions section hereof.

(b)    No Strict Construction. Buyer and Seller participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer and Seller, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limiting the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE 2
### PURCHASE AND SALE

2.1    Purchase and Sale.

Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement, effective at the time of the Closing (a) Seller shall unconditionally sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase, acquire and accept from Seller, free and clear of any and all Liens (other than Assumed Liens), all of the Acquired Assets, and (b) Buyer shall unconditionally assume and agree to discharge and perform when due, all of the Assumed Liabilities that are related to, associated with or pertaining to the Business and the Acquired Assets.

2.2    Acquired Assets.

For all purposes of and under this Agreement, the term "Acquired Assets" shall mean all of Seller's right, title and interest in, to or under the following (other than the Excluded Assets): (i) all of Seller's properties, rights, claims and assets of every kind and description (wherever situated or located, real, personal or mixed, tangible or intangible, whether identifiable or contingent, owned, leased, licensed) related to, associated with, pertaining to, or presently, historically or prospectively used in or held for use in the operation of the Business as conducted by Seller, whether or not reflected on the books and records of Seller, and (ii) without limiting the generality of Section 2.2(i) above, such Acquired Assets shall include, whether they relate to the Business or not (except where so noted in the following list or in any definition used in the following list), all of Seller's direct or indirect right, title and interest in, to and under the following (other than the Excluded Assets):

(a)    all inventory of any kind or nature, merchandise and goods related to the Business or Acquired Assets and maintained, held or stored by or for Seller on the Closing Date, whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same, including raw materials, components and other parts, work-in-process, finished goods or products, packaging materials and labels, and other stores, supplies, disposables and consumables used in or held for use in the operation of the Business as conducted by Seller, including any goods or products in transit ("Inventory");

(b)    all Equipment;

(c)    all Assigned Contracts;

15

(d)　　all (i) Real Property (other than Leased Real Property to the extent the Leases related thereto are not Assigned Contracts) and any such agreements and rights related thereto or under the applicable Leases, and (ii) the Lessor Leases (to the extent the Lessor Lease is an Assigned Contract), in each case, together with all interests in and to all Improvements located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(e)　　subject to Section 2.6(c), all Permits and pending applications therefor of Seller used in, held for use in, or necessary for the operation of the Business or the Acquired Assets, including all Permits described in Section 2.2(e) of the Disclosure Schedules, in each case, to the extent transferable under applicable Legal Requirements (the "Transferred Permits");

(f)　　all Intellectual Property;

(g)　　all Accounts Receivable;

(h)　　all contribution or reimbursement Claims that Seller has or may have against any Affiliate of Buyer;

(i)　　all Pre-Paid Expenses except for those set forth Section 2.2(i) of the Disclosure Schedules;

(j)　　all goodwill and intangible property relating to, arising from or associated with any of the Acquired Assets (including the Intellectual Property), the Assumed Liabilities or the Business;

(k)　　to the extent permitted by Legal Requirements, and except to the extent related to the Excluded Assets or the Excluded Liabilities, all Documents and other books and records (financial, accounting and other), and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, owned software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case, arising under or relating to the Acquired Assets, the Assumed Liabilities or the Business;

(l)　　all rights, remedies and benefits of Seller arising under or relating to any of the Acquired Assets, the Assumed Liabilities or the Business, including rights, remedies and benefits arising out of express or implied warranties, representations and guarantees from suppliers, manufacturers, contractors or others to the extent relating to the operation of the Business or affecting the Inventory, Equipment, Real Property, or other tangible Acquired Assets or ordered by Seller prior to the Closing Date (and in any case, any component thereof), and all claims and causes of action arising or existing therefrom, in each case, other than as they relate to any Excluded Cause of Action;

(m)　　other than as they exclusively relate to any Excluded Causes of Action, which, for the avoidance of the doubt, shall be retained by Seller, and subject to Section 2.2(n) and Section 2.2(p), any and all Actions or other causes of action, and any rights, claims, demands, privileges, set offs, counterclaims, defenses, assertions or rights of any kind as against others (whether by contract or otherwise) of, or on behalf of, Seller with respect thereto, including (A) any and all causes of action, rights, claims, counterclaims, defenses or assertions of Seller against or with respect to any direct or indirect equityholders of Seller, (B) any and all causes of action, rights, claims, counterclaims, defenses or assertions of Seller against or with respect to

16

any direct or indirect lender to Seller, (C) any and all causes of action, rights, claims, counterclaims, defenses or assertions of Seller against or with respect to any Affiliate of Seller (including any party or Affiliate of a party set forth on Section 2.2(m) of the Disclosure Schedules), and (D) any and all causes of action, rights, claims, counterclaims, defenses or assertions of Seller with respect to any Trade Payables;

(n)        all Avoidance Actions, except for Excluded Causes of Action;

(o)        after the deduction of all Excluded Cash, (x) to the extent transferable, all bank deposit accounts, control agreements and lockbox accounts of Seller associated with the collection of the Accounts Receivable or other proceeds from the Business, including all bank accounts that receive checks, ACH payments, and electronic payments (a complete list of all such accounts (including any deposit accounts, securities accounts and any sub-accounts) and amounts in such accounts are as set forth on Section 2.2(o) of the Disclosure Schedules); provided, that to the extent any such account is not transferable, at Closing, Seller shall grant access to and control over any such account to allow Buyer to sweep or otherwise withdraw any funds held in any non-transferable account, and (y) all Cash remaining, including (i) any checks, commercial paper, treasury bills, certificates of deposit and other bank deposits, instruments and investments of Seller, and (ii) any Cash held in any escrow account, trust account, or similar account, any rights thereto, any escrow agreements or other Contracts governing such funds and Seller's rights thereunder, and any other interests or rights with respect to any of the foregoing;

(p)        all (i) rights under, with respect to, or arising out of any Transferable Insurance Policies relating to the Business or any of the Acquired Assets or Assumed Liabilities, (ii) returns and refunds of any premiums paid, or other amounts due back to Seller, with respect to any cancelled insurance policies, and (iii) third-party property and casualty insurance proceeds, to the extent receivable by Buyer or Seller in respect of the Business or the Acquired Assets after the Closing Date (whether under current or prior policies or under the Transferable Insurance Policies), in each case, other than under, with respect to, or receivable as a result of the Excluded Insurance Policies or with respect to such Transferable Insurance Policies that exclusively relate to Excluded Causes of Action;

(q)        all rights, but not obligations, under non-disclosure or confidentiality, non-compete, no-hire or non-solicitation agreements or similar arrangements entered into in connection with or in contemplation of the auction contemplated by the Bidding Procedures (the "Auction"), in each case, to the extent transferrable and related to the Business;

(r)        all telephone numbers and other directory listings, e-mail addresses, websites, URLs, internet domain names and social media sites and accounts (including the content contained therein and any usernames and passwords), owned or licensed by Seller;

(s)        all other property and assets related to, associated with, pertaining to, or presently, historically or prospectively used in or held for use in the Business as conducted by Seller or the ownership of the Acquired Assets, in each case, of every kind and description and wherever located, and the proceeds thereof and all other tangible and intangible assets but, in each case, to the extent not expressly identified as Excluded Assets;

(t)        all assets, if any, listed on Section 2.2(t) of the Disclosure Schedules (regardless of whether such assets are covered by any of the foregoing);

17

(u)    any and all rights to Tax Refunds of Seller for any tax period, including, for the avoidance of doubt, any and all rights to the Employee Retention Credit; and

(v)    the Tax records, work papers and other records of Seller as they pertain to ownership, organization, qualification to do business or existence of Seller;

(w)    the Klein Settlement Amount;

(x)    all Excess Cash; and

(y)    all proceeds and products of any and all of the foregoing Acquired Assets.

2.3    Excluded Assets.

Notwithstanding anything to the contrary in this Agreement (including Section 2.2), nothing herein shall be deemed to sell, transfer, assign, convey or deliver any of the Excluded Assets to Buyer, and Seller shall retain all right, title and interest to, in and under, the Excluded Assets. For all purposes of and under this Agreement, the term "Excluded Assets" shall consist of only the following:

(a)    the assets, if any, listed on Section 2.3(a) of the Disclosure Schedules;

(b)    any shares of capital stock or other equity interest in or issued by Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by Seller;

(c)    all Documents and other books and records (financial, accounting and other), and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case, (A) that relate exclusively to the Excluded Assets or Excluded Liabilities, (B) that if transferred as an Acquired Asset would violate any Person's privacy rights under applicable Legal Requirements, or (C) that are subject to any attorney-client, work product or similar privilege with respect to work performed in anticipation of or in connection with the preparation or administration of the Bankruptcy Case, this Agreement or the Transactions;

(d)    any Contract that is not an Assigned Contract;

(e)    all rights of Seller under or arising out of any insurance policy set forth on Section 5.11 of the Disclosure Schedules that is not a Transferable Insurance Policy (the "Excluded Insurance Policies") or with respect to Excluded Causes of Action under Transferable Insurance Policies;

(f)    Avoidance Actions that have been expressly excluded by Buyer in writing on or after the Effective Time;

(g)    all Excluded Causes of Action;

(h)    except as otherwise set forth herein, any rights, claims or causes of action of Seller arising under this Agreement or any other Transaction Document;

18

(i)       all Cash of Seller in an amount equal to, and not in excess of, (i) the aggregate amount of remaining Cash included in the Wind-Down Budget *less* (ii) the aggregate amount of Estimated Wind-Down Expenses actually paid prior to the Closing, *plus* (iii) any portion of the Purchase Price actually paid by Buyer in Cash (together, the "Excluded Cash");

(j)       all Benefit Plans, together with all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts related thereto), and all rights and obligations thereunder;

(k)       all insurance policies other than the Transferable Insurance Policies; and

(l)       all proceeds and products of any and all of the foregoing Excluded Assets.

2.4       Assumed Liabilities.

Except to the extent that any of the following are specified in Section 2.5 as Excluded Liabilities, the following Liabilities of Seller (and only the following Liabilities expressly set forth in this Section 2.4) shall constitute, without duplication, the "Assumed Liabilities":

(a)       all Liabilities arising out of the ownership, possession or operation of the Acquired Assets; provided, that if an Action is brought after the Closing Date, but is related to conduct prior to the Closing Date, such Liability shall not be an Assumed Liability and shall be deemed an Excluded Liability unless Buyer consents in writing to assume such Action

(b)       all Liabilities under the Assigned Contracts;

(c)       all Cure Costs;

(d)       any Accounts Payable (including Trade Payables) owed by Seller to any Person;

(e)       those specific Liabilities of Seller, if any, set forth on Section 2.4(e) of the Disclosure Schedules;

(f)       the Assumed Taxes; and

(g)       the Warranty Claims.

The assumption by Buyer or Buyer Designee of any Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

2.5       Excluded Liabilities.

Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume, and shall not be liable for, any of the following Liabilities, whether existing on or prior to the Closing Date or arising thereafter, and whether known or unknown, absolute or contingent, matured or unmatured, direct or indirect (collectively, the "Excluded Liabilities"), all of which shall remain the sole responsibility of Seller:

(a)       any and all Liabilities arising under, or otherwise relating to, the Pre-Petition Debt Documents;

19

(b)     all Liabilities relating to the Excluded Causes of Action other than Liabilities relating to the Warranty Claims;

(c)     all Liabilities with respect to any Excluded Asset, including Contracts that are not Assigned Contracts;

(d)     all Liabilities for costs and expenses: (i) incurred or owed in connection with the administration of the Bankruptcy Case (including all Estimated Wind-Down Expenses); and (ii) incurred in connection with the negotiation, execution and consummation of the Transactions.

(e)     all Liabilities of the Seller arising under or in connection with any employee benefit plan providing compensation or benefits to any current or former employee of such Seller and all Liabilities arising out of, relating to, resulting from or with respect to the employment or engagement (or termination of employment or engagement) of any current or former officers, directors, employees, leased employees, managers, independent contractors, applicants or consultants (or their respective representatives or beneficiaries) of Seller, including, without limitation, any Liability under the WARN Act or associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, or employee deferred compensation, including equity-based plans, grants and agreements, severance, retention, termination, or other payments, in each case, except as otherwise provided in this Agreement or arising out of or relating to workers' compensation benefits, obligations, or liabilities under any applicable workers' compensation statutes; and

(f)     all Post-Closing COBRA Liabilities, whenever occurring;

(g)     all Liabilities relating to any (x) Multiemployer Plan, pre-closing funding obligation, and penalties assessed by a Governmental Authority and (y) Benefit Plan, in the case of (x) and (y), whether arising prior to, at or after, the Closing Date;

(h)     all pre-Closing Liabilities to the extent such Liabilities are not Assumed Liabilities; and

(i)     all Liabilities for Taxes  other than the Assumed Taxes and Transfer Taxes.

2.6     Assignment and Assumption of Contracts.

(a)     Assignment and Assumption at Closing.

(i)   Section 2.6(a) of the Disclosure Schedules sets forth a list of all executory Contracts (including all Leases, Lessor Leases and other Material Contracts) to which Seller is party and which are to be included in the Acquired Assets (the "Assigned Contracts") and Seller's good faith estimate of the Cure Costs as of the Execution Date (such Section 2.6(a) of the Disclosure Schedules, as such exists at the time of execution of this Agreement without any additions or deletions, the "Execution Date Contract Schedule"). From and after the Execution Date, Seller shall make such additions and deletions to Section 2.6(a) of the Disclosure Schedules as, and solely to the extent, requested by Buyer in writing. Any such added Contract shall be deemed an Assigned Contract and any such deleted Contract shall be deemed to no longer be an Assigned Contract. All Contracts of Seller that are not listed on Section 2.6(a) of the Disclosure Schedules shall not be considered an Assigned Contract or Acquired Asset and shall be deemed a Rejected Contract.

20

(ii)   Seller shall take all actions required to seek an Order containing a finding that the proposed assumption and assignment of the Assigned Contracts to Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code; provided, however, that no material monetary amount shall be required to be paid or incurred by Seller in connection with any consent or approval from any Person that is required to assume and assign any Assigned Contract to Buyer.

(iii)   At Closing, (x) Seller shall, pursuant to the Sale Order and the Assignment and Assumption Agreement, assume and assign to Buyer, in each case, as and solely to the extent Buyer is assuming (the consideration for which is included in the Purchase Price), each of the Assigned Contracts that is capable of being assumed and assigned and is being assumed and assigned by Buyer, and (y) Buyer shall pay promptly all Cure Costs (if any) as required by the Bankruptcy Code (as determined by the Bankruptcy Court) in connection with such assumption and assignment and assume and perform and discharge as due the Assumed Liabilities (if any) under such applicable Assigned Contracts, pursuant to this Agreement and the applicable Assignment and Assumption Agreement to which such Buyer is a party; provided, however, that, in no event shall Buyer be required to assume, be deemed to assume, or otherwise be liable for any Excluded Liabilities (including with respect to any Cure Costs applicable to any Contract that Buyer is not assuming). Notwithstanding anything in this Agreement, the Sale Order, any Transaction Document or the Disclosure Schedules (including Section 2.6(a)), Buyer is not assuming, and shall not be deemed to assume, any Contract to the extent that, upon assumption of such Contract by Buyer, Buyer shall also be deemed to assume any Liability in respect of any Excluded Cause of Action, and any such Contracts are hereby carved out, severed and excluded from the assumption and assignment to Buyer and shall remain Excluded Liabilities, and shall not be deemed to be "Assigned Contracts" hereunder.

(b)   Previously Omitted Contracts. If prior to or following Closing, it is discovered that a Contract should have been listed on Section 2.6(a) of the Disclosure Schedules but was not listed on Section 2.6(a) of the Disclosure Schedules (any such Contract, a "Previously Omitted Contract"), Seller shall promptly following the discovery thereof notify Buyer of such omission and Buyer shall provide written notice to Seller designating such Previously Omitted Contract as "Assumed" or "Rejected". Seller shall, promptly following Buyer's written notice, serve a notice (the "Previously Omitted Contract Notice") on the counterparties to any such Previously Omitted Contract designated as "Assumed" by Buyer, notifying such counterparties of the Cure Costs with respect to such Previously Omitted Contract and Seller's intention to assume and assign such Previously Omitted Contract in accordance with this Section 2.6. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with fourteen (14) days to object, in writing to Seller and Buyer, to the Cure Costs or the assumption of its Contract. If the counterparties, Seller and Buyer are unable to reach a consensual resolution with respect to the objection, Seller will seek an expedited hearing before the Bankruptcy Court to determine the Cure Costs and approve the assumption. If no objection is served on Seller and Buyer, Seller shall obtain an order of the Bankruptcy Court fixing the Cure Costs and approving the assumption of the Previously Omitted Contract, and no further order or approval shall be required. Any Previously Omitted Contract that is assumed and assigned pursuant to this Section 2.6(b) shall be deemed an Assigned Contract and Buyer shall be liable for all Cure Costs associated with such Assigned Contract and any Previously Omitted Contract that is not assumed and assigned pursuant to this Section 2.6(b) shall not be considered an Assigned Contract or Acquired Asset and shall be deemed a "Rejected Contract".

21

(c)      Non-Assignment of Contracts and Permits.

(i)      Notwithstanding anything contained in this Agreement to the contrary but subject to the last sentence of this Section 2.6(c), this Agreement shall not constitute an agreement to assign or transfer any Contract or any Permit, if, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would constitute a breach thereof or in any way adversely affect any of the rights of Buyer, as the assignee or transferee of such Contract or Permit (as the case may be), thereunder.

(ii)      Nothing in this Agreement shall be construed as an attempt by Seller to assign any Assigned Contract or any other Acquired Asset to the extent that such Assigned Contract or Acquired Asset is not assignable under the Bankruptcy Code or otherwise without the consent of the other party or parties thereto or any Governmental Authority, if applicable Law would require such consent, and the consent of such other party or Governmental Authority has not been given or received, as applicable. With respect to any Assigned Contract or Acquired Asset for which the consent of a party thereto or any Governmental Authority to the assignment thereof shall not have been obtained at or prior to the Closing Date, Seller and Buyer shall use their commercially reasonable efforts for a period not to exceed sixty (60) days after the Closing Date to obtain such consent as expeditiously as reasonably possible. Unless and until any such consent, waiver, confirmation, novation or approval is obtained, upon Buyer's written request, Seller and Buyer shall reasonably cooperate to establish an arrangement reasonably satisfactory to Seller and Buyer under which Buyer would obtain the Claims, rights and benefits and assume the corresponding Liabilities and obligations thereunder (including by means of any subcontracting, sublicensing or subleasing arrangement). In such event, (i) Seller will hold in trust for and promptly pay to Buyer, when received, all moneys received by them under any such Assigned Contract or in respect of any such Acquired Asset, Claim, right or benefit arising thereunder, and (ii) Buyer will promptly pay, perform or discharge, when due, any and all obligations and Liabilities arising thereunder, other than those being contested in good faith. In the event any consent required with respect to any Assigned Contract or Acquired Asset for which the consent of a party thereto or any Governmental Authority to the assignment thereof is not obtained within the sixty (60) day period after the Closing Date, such Assigned Contract or Acquired Asset, as applicable, shall be deemed to be an Excluded Asset.

2.7      Wind-Down Budget.

(a)      Seller agrees that no Assumed Liabilities will be included in or reflected on the Wind-Down Budget. At least two (2) Business Days prior to the Bid Deadline (as defined in the Bidding Procedures Order), Seller and Buyer shall mutually agree upon the Wind-Down Budget and the amount required to fund the Wind-Down Budget. Prior to Closing, Buyer may, in its sole and absolute discretion, agree to assume any Liability that is included in the Wind-Down Budget (including any or all of the 503(b)(9) claims set forth therein) by providing written notice to Seller and, in such event, (a) such Liability shall be deemed to be, and shall become, an Assumed Liability subject to the terms and conditions of this Agreement, (b) the Wind-Down Budget and the Estimated Wind-Down Expenses shall be reduced on a dollar-for-dollar basis for any such Liability that has been so assumed, and (c) the Wind-Down Budget shall be amended and restated to reflect such adjustment.

(b)	The Seller (or any estate representative, liquidating trustee, or other fiduciary appointed pursuant to the Sale Order, Confirmation Order, or the Plan, the "Trustee, the "Trustee") shall, in consultation with Buyer, establish a reasonable reserve (the "Wind-Down Reserve") for the payment of post-Closing wind-down and professional expenses of the Seller and its bankruptcy estate. The amount of the Wind-Down Reserve shall be determined by the Trustee, each acting reasonably in consultation with the Buyer and shall be subject to the Buyer's consent in its sole discretion.

(c)	On the date that is seventy-five (75) days after the Closing Date (or such later date as the Buyer and the Trustee may agree) (the "Excess Cash Payment Date"), the Seller or the Trustee shall pay, or cause to be paid, to Buyer by wire transfer of immediately available funds an amount equal to all Excess Cash then remaining, free and clear of all Liens (other than Permitted Liens) and Claims.

2.8	Further Assurances.

At and after the Closing, and without further consideration therefor, Seller shall execute and deliver to Buyer such further instruments and certificates as shall be necessary (a) to vest, perfect or confirm ownership (of record or otherwise) in Buyer, Seller's right, title or interest in, to or under any or all of the Acquired Assets and the Business, including the Real Property, free and clear of any and all Liens (other than Assumed Liens), or (b) to otherwise effectuate the purposes and intent of the Transaction Documents or for aiding, assisting, collecting and reducing to possession any of the Acquired Assets and exercising rights with respect thereto. Each of Seller, on the one hand, and Buyer, on the other hand, shall take, or cause to be taken, all actions and shall do, or cause to be done all things as may be reasonably requested by the other Party in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Buyer, or otherwise to carry out this Agreement and shall execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances, and as may be reasonably required to consummate the Transactions.

2.9	Withholding.

Buyer and any other applicable withholding agent shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any Person such amounts as Buyer or such withholding agent is required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment. Prior to withholding any amounts (except with respect to compensatory payments to employees) pursuant to this Section 2.9, the Party on behalf of whom such amounts are withheld shall use commercially reasonable efforts to provide prior written notice to the other Party of such withholding.

2.10	Payments Following Closing.

Seller shall hold in trust and promptly pay over to Buyer any monies received by Seller following the Effective Time that is the property of Buyer by virtue of the purchase and sale of the Acquired Assets. Seller shall use reasonable best efforts to assist Buyer in the collection of Accounts Receivable included in the Acquired Assets and the reasonable transition of account information and notifying third parties for the purpose of effecting the transfer of the Business to Buyer in accordance with this Agreement.

**ARTICLE 3**
**PURCHASE PRICE**

3.1     Consideration.

The aggregate consideration (the "Purchase Price") for the purchase, sale, assignment and conveyance of Seller's right, title and interest in, to and under the Acquired Assets shall consist of:

(a)     the assumption by Buyer of the Assumed Liabilities from Seller, including the assumption of the obligation to pay to the applicable counterparties of the applicable Assigned Contracts the Cure Costs payable by Buyer under Section 2.6; *plus*

(b)     the Credit Bid in an aggregate amount equal to the outstanding obligations under the DIP Term Sheet as of the Closing (which amount shall not be less than $13,000,000.00 as of the Closing), exercised by Buyer or its designee in accordance with section 363(k) of the Bankruptcy Code and the DIP Order; *plus*

(c)     such additional cash consideration, the use, allocation and amount of which shall be determined at the sole discretion of Buyer and by providing written notice to Sellers; provided, however, that if no such notice has been provided, then the amount of such cash consideration under this Section 3.1(a)(iv) shall be $0.

3.2     Limitation on Buyer Liability.

Except indirectly with respect to any expenses in the Wind-Down Budget that are or become an Assumed Liability pursuant to Section 2.7, neither Buyer nor any Buyer Designees shall have any liability with respect to the Estimated Wind-Down Expenses or with respect to any amounts that would have been such fees or expenses if not for the limitations contained in this Agreement.

**ARTICLE 4**
**CLOSING AND DELIVERIES**

4.1     Closing Date.

Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing", and the date and time as of which the Closing occurs, the "Closing Date") shall take place at the offices of Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY, or by exchanging documents and signature pages electronically or by other mutually acceptable means of exchange, on the Business Day that is neither less than three (3) Business Days, nor later than five (5) Business Days, following the date on which all the conditions set forth in ARTICLE 9 and ARTICLE 10 have been satisfied or (if permissible) waived by the Party entitled to waive such condition (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions at the Closing), or on such other date and time as Seller and Buyer may mutually agree in writing. Upon consummation of the Closing, the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities hereunder shall be deemed to have occurred as of the Effective Time.

4.2     Buyer's Deliveries.

(a)     Subject to satisfaction or (if permissible) waiver of the conditions set forth in ARTICLE 9 and ARTICLE 10, at the Closing, Buyer shall deliver (or cause one or more of its Affiliates to deliver) to Seller:

24

    (i)  the Purchase Price as adjusted pursuant to Section 3.1.

    (ii)  one or more Assignment and Assumption Agreements, duly executed by Buyer;

    (iii)  each other Transaction Document to which Buyer is a party, duly executed by Buyer or Buyer Designee, as applicable;

    (iv)  the certificates of Buyer (signed by a duly authorized officer thereof) to be received by Seller pursuant to Sections 10.1 and 10.3;

    (v)  a certificate of an authorized officer, manager or managing member of Buyer, dated the Closing Date, in form and substance reasonably satisfactory to Seller, as to (i) Buyer's and each Buyer Designee's authorization to execute and perform its obligations under the Transaction Documents to which each of them is a party, and (ii) incumbency and signatures of the individuals executing the Transaction Documents on behalf of Buyer and any Buyer Designee;

    (vi)  Joinders duly executed by any Buyer Designees designated by Buyer to purchase any of the Acquired Assets or assume any of the Assumed Liabilities pursuant to the terms of this Agreement; and

    (vii)  such other documents as Seller may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the Transactions.

Any amounts payable in cash pursuant to Section 4.2(a)(i) and 4.2(a)(ii) shall be paid in cash by wire transfer to the account or accounts designated by Seller to Buyer at least one (1) Business Day prior to Closing.

    (b)  Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 4.2(b), one or more Affiliates of Buyer to (i) purchase specified Acquired Assets; or (ii) assume specified Assumed Liabilities, in each case, as of the Closing Date (any Person that shall be properly designated by Buyer in accordance with this clause, a "Buyer Designee"); it being understood and agreed, however, that any such right of Buyer to designate a Buyer Designee is conditioned upon (x) such Buyer Designee being able to perform the applicable covenants under this Agreement in all respects and, as applicable, any other Transaction Document to which Buyer is party, (y) such Buyer Designee being able to demonstrate satisfaction of the requirements of Section 365 of the Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance with respect to the Acquired Assets and Assumed Liabilities, and (z) such designation not, and not being reasonably expected to, cause a delay or prevent or hinder the consummation of the Transactions in any respect. At least five (5) Business Days prior to or at Closing, Buyer shall make any such designations of Buyer Designees by way of a written notice (email to suffice) to be delivered to Seller. No such designation shall relieve Buyer of any of its obligations hereunder and any breach hereof by a Buyer Designee shall be deemed a breach by Buyer. Buyer and Buyer Designees shall be jointly and severally liable for any obligations of Buyer and such Buyer Designees hereunder. For the avoidance of doubt, and notwithstanding anything to the contrary herein, all Buyer Designees appointed in accordance with this Section 4.2(b) shall be included in the definition of "Buyer" for all purposes under this Agreement and all such Buyer Designees shall be deemed to have made all of the representations and warranties of Buyer set forth in this Agreement.

4.3        Seller Deliveries.

At the Closing, Seller shall deliver to Buyer:

(a)        possession of the Acquired Assets (except for Excess Cash which will be delivered on the Excess Cash Payment Date) and the Business;

(b)        the Bills of Sale, the Assignment and Assumption Agreement and each other Transaction Document to which Seller is a party, duly executed by Seller;

(c)        with respect to the Real Property included in the Acquired Assets, possession of such Real Property, together with any and all keys, access cards, security passcodes and combinations, and copies (and originals in Seller's possession) of all instruments, Leases and agreements evidencing Seller's interest in the same, and any existing surveys, legal descriptions and title policies concerning such Real Property that are in the possession of Seller, which shall be deemed to be delivered to the extent located at any Real Property;

(d)        a certified copy of the Sale Order;

(e)        the certificates of Seller (signed by a duly authorized officer thereof) to be received by Buyer pursuant to Sections 9.1, 9.2 and 9.8;

(f)        releases and termination statements sufficient for Buyer to receive the Acquired Assets free and clear of any and all Liens (other than Assumed Liens); provided, however, that releases shall not be required with respect to Liens that are both (i) released by the Sale Order, and (ii) not required to be released at Closing pursuant to releases and termination statements in connection with a financing or debt facility obtained by Buyer; and

(g)        such other documents as Buyer may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the Transactions.

## ARTICLE 5
### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows, except as disclosed in the Disclosure Schedules attached hereto:

5.1        Organization and Good Standing.

Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Seller has all requisite limited liability company power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted, except for such failures to have such power or authority would not, individually or in the aggregate, have a Material Adverse Effect. Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of its Business or the nature of its properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

5.2        Authority; Validity; Consents.

Seller has, subject to entry of the Sale Order, the requisite limited liability company power and authority necessary to enter into and perform its obligations under this Agreement and

the other Transaction Documents to which Seller is a party and to consummate the transactions contemplated hereby and thereby, and, subject to entry of the Sale Order, the execution, delivery and performance of this Agreement and such other Transaction Documents by Seller and the consummation by Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite limited liability company action. This Agreement has been duly and validly executed and delivered by Seller, and each other Transaction Document required to be executed and delivered by Seller at the Closing will be duly and validly executed and delivered by Seller at the Closing. Subject to entry of the Sale Order, this Agreement and the other Transaction Documents constitute, with respect to Seller, legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as such enforceability is limited by general principles of equity. Subject to entry of the Sale Order, except, in each case, (a) for entry of the Sale Order, (b) for notices, filings and consents required in connection with the Bankruptcy Case, and (c) for the notices, filings and consents set forth on Section 5.2 of the Disclosure Schedules, Seller is not required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from, any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby. Seller has determined that Buyer and this Agreement meet all of the requirements to be, and constitute, a Qualified Bidder and a Qualified Bid, respectively, pursuant to the terms of the Bidding Procedures.

5.3     Subsidiaries.

Seller does not (a) have any direct or indirect Subsidiaries; (b) have any direct or indirect interest in, and is not under any current or prospective obligation to receive an interest in, any shares or ownership interest in any other Person; or (c) participate in any partnership, joint venture or similar arrangement.

5.4     No Conflict.

Except as set forth in Section 5.4 of the Disclosure Schedules, neither the execution and delivery by Seller of this Agreement or any other Transaction Document to which it is (or will be) a party nor after giving effect to the Sale Order, the consummation of the transactions contemplated hereby or thereby nor, after giving effect to the Sale Order, compliance by it with any of the provisions hereof or thereof will (a) conflict with or result in a violation of (i) any provision of the certificate of formation or limited liability company agreement (or other organizational or governing documents) of Seller, or (ii) any Legal Requirement binding upon Seller or by which the Business or any Acquired Assets are subject or bound, (b) after giving effect to the Sale Order, violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under (i) any Material Contract, or (ii) any Permit or Order, or (c) result in the creation of any Lien upon the properties or assets of Seller being sold or transferred hereunder, except, in each case, of clause (b)(i) and clause (c) above, as would not, individually or in the aggregate, have a Material Adverse Effect.

5.5     Real Property.

(a)     Owned Real Property. Except as set forth on Section 5.5(a) of the Disclosure Schedules, Seller does not own any Real Property and has not owned any Real Property during the past three (3) years.

(b)      Lessor Leases. Section 5.5(b) of the Disclosure Schedules lists, as of the Execution Date, all unexpired leases, subleases, licenses, occupancy or other agreements to which Seller is a party whereby Seller leases, subleases, licenses or grants an interest in any Leased Real Property to a third party (the "Lessor Leases").

(c)      Leased Real Property. Section 5.5(c) of the Disclosure Schedules contains a list of all Leased Real Property held or used for, or necessary or important to the operation of the Business. To Seller's Knowledge, the Leases will continue to be legal, valid, binding, enforceable and in full force and effect on the same material terms immediately following the consummation of the Transactions.

5.6      Title to Acquired Assets.

Immediately prior to Closing, Seller will have, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 4.3, and upon entry of the Sale Order, Seller will thereby transfer to Buyer, and Buyer will (subject to Section 2.6(c)) be vested, to the maximum extent permitted by sections 363 and 365 of the Bankruptcy Code, with good, valid and marketable title to, or, in the case of property leased or licensed by Seller, a valid leasehold or licensed interest in, all of the Acquired Assets, free and clear of any and all Liens, except (a) for the Assumed Liabilities, and (b) for Assumed Liens.

5.7      Compliance with Legal Requirements.

The Permits set forth on Section 2.2(e) of the Disclosure Schedules (a) are all of the material Permits held by Seller with respect to the current operation and conduct of the Business and the Acquired Assets, and (b) constitute all materials Permits necessary for the current operation and conduct of the Business and the Acquired Assets.

5.8      Labor Matters.

(a)      Seller does not currently employ, engage, or otherwise retain any employees, independent contractors, consultants, temporary workers, or other service providers, whether full-time, part-time, or otherwise. No individual or entity is entitled to any wages, compensation, benefits, severance, or other payments from Seller in respect of any employment or service relationship, and there are no outstanding offers of employment or engagement made by Seller.

(b)      Seller is not party to or subject to any collective bargaining agreements, works council agreements, labor union contracts, trade union agreements or other similar agreements (each, a "Collective Bargaining Agreement") with any labor union, trade union, works council, labor organization or other employee representative body (each, a "Union" and collectively, "Unions"), nor is any such Collective Bargaining Agreement currently being negotiated by Seller.  The consummation of the transactions contemplated by this Agreement will not give rise to, or trigger, any notice, consultation, bargaining, or similar obligations on the part of Seller with respect to any Union. In the past three (3) years, to the Knowledge of Seller, there have been no actual or threatened strikes, lockouts, slowdowns, work stoppages, organizing campaigns or efforts, demands or petitions for recognition, boycotts, handbilling, picketing, walkouts, demonstrations, leafleting, sit-ins, sick-outs or other material forms of organized labor disruption with respect to Seller.

5.9     Employee Benefits.

(a)     As of the date hereof, Seller does not sponsor, maintain, contribute to or have any obligation to maintain or contribute to, or have any Liability in respect of any Benefit Plan.

(b)     Seller does not maintain, contribute to or have any obligation to maintain or contribute to, or has ever maintained or contributed to, or has or ever had any direct or indirect Liability with respect to, (i) any plan subject to Title IV of ERISA or Section 412 of the Code, (ii) any plan maintained by more than one employer within the meaning of Section 413(c) of the Code, (iii) any plan subject to Sections 4063 or 4064 of ERISA, (iv) a Multiemployer Plan, or (v) a "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA. No Liability under Title IV of ERISA has been incurred by Seller that has not been satisfied in full.

(c)     Neither Seller, nor, to Seller's Knowledge, any other "party in interest" or "disqualified person" with respect to any Benefit Plan has engaged in a nonexempt "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code.

(d)     Seller has no obligation to provide or make available post-employment benefits under any Benefit Plan which is a "welfare plan" (as defined in Section 3(1) of ERISA) to any current or former employee or service provider, except as may be required under COBRA and at the sole expense of such individual.

5.10     Contracts.

The Execution Date Contract Schedule sets forth a complete list, as of the Execution Date, of all Material Contracts (including all Leases) to which Seller is a party and sets forth (a) Seller's good faith estimate of the Cure Costs with respect to each Material Contract listed thereon with respect to each such contract, and (b) the applicable category of such Material Contract. Seller has not assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any such Contract listed on the Execution Date Contract Schedule. Each such Contract listed on the Execution Date Contract Schedule is in full force and effect and is a legal, valid, binding and enforceable obligation of Seller in accordance with its terms and conditions, in each case, except (a) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, (b) as set forth on Section 5.10 of the Disclosure Schedules, and (c) as would not, individually or in the aggregate, have a Material Adverse Effect. Seller has made available, or, within fifteen (15) Business Days of the Execution Date but in any event no later than four (4) Business Days prior to the Auction, will make available correct and complete copies of all such Contracts set forth on the Execution Date Contract Schedule to Buyer, including any amendments thereto. Upon entry of the Sale Order and payment of the Cure Costs, (i) Seller will not be in material breach or default of its obligations under any Assigned Contract, and (ii) to Seller's Knowledge, no other party to any Assigned Contract is in material breach or default thereunder. To Seller's Knowledge, the Contracts set forth on the Execution Date Contract Schedule will continue to be legal, valid, binding and enforceable and in full force and effect on the same terms as immediately following the consummation of the transaction contemplated hereby.

5.11      Insurance.

Seller maintains the insurance policies set forth on Section 5.11 of the Disclosure Schedules, which sets forth all insurance policies covering the Acquired Assets, current (if applicable) or former employees of Seller and operation of the Business (including policies providing property, casualty, professional liability and workers' compensation coverage, but excluding insurance policies with respect to Benefit Plans). Such policies are in full force and effect. To the Knowledge of Seller, Seller has paid all premiums on such policies due and payable prior to the Closing Date. Seller has not done anything by way of action or inaction that invalidates any such policies in whole or in part. To Seller's Knowledge, all insurance policies maintained by Seller provide coverage appropriate in character and amount for the Acquired Assets, employees of Seller (if applicable), and operations of the Business as presently conducted. Furthermore, Seller has not received any written notice of cancellation of, premium increase with respect to, or alteration of coverage under, any such insurance policies. Except as set forth on Section 5.11 of the Disclosure Schedules, there are no claims related to the Business pending under any such insurance policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights.

5.12      "AS IS" Transaction.

Except as specifically provided in Section 5.1 through Section 5.11 above, Seller will convey the Acquired Assets to Buyer on an "As-Is, Where-Is" and "With All Faults" basis, without representations, warranties, or covenants, express or implied, of any kind or nature.  Buyer hereby waives and relinquishes all rights and privileges arising out of, or with respect or in relation to, any representations, warranties, or covenants, whether express or implied, that may have been made or given, or that may have been deemed to have been made or given, by Seller or Seller's Representatives, except for those expressly set forth in this Agreement.  None of Seller nor any other Person is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, relating to Seller (including, but not limited to, any relating to financial condition, results of operations, assets or liabilities of such Seller), except as expressly set forth in this Article 5, and Seller hereby disclaims any such other representations or warranties.

## ARTICLE 6
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

6.1      Organization and Good Standing.

Buyer is a corporation, duly incorporated, validly existing and in good standing under the laws of its jurisdiction of organization. Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

6.2      Authority; Validity; Consents.

Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the Transactions have been duly and validly authorized by all requisite limited liability company or corporate actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a party and will be duly and validly executed

and delivered by Buyer, as applicable, at the Closing. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except, in each case, as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Except as set forth on Section 6.2 of the Disclosure Schedules, Buyer is not and will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a party or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, materially affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents to which it is a party or to consummate the transactions contemplated hereby or thereby.

6.3     No Conflict.

Neither the execution and delivery by Buyer of this Agreement or the other Transaction Documents to which it is a party nor the consummation of the transactions contemplated hereby or thereby nor compliance by it with any of the provisions hereof or thereof (a) conflict with or result in a violation of (i) any provision of the organizational documents of Buyer, or (ii) any Legal Requirement binding upon Buyer, or (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under (i) any note, bond, mortgage, indenture, deed of trust, Contract or other instrument or obligation to which Buyer is a party or by which Buyer may be bound or to which any of Buyer's assets may be subject or affected in any material respect and that, in each case, is material to the business of Buyer or that would individually or in the aggregate, materially affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Document to which it is a party or to consummate the transactions contemplated hereby or thereby, or (ii) any material license, permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority.

6.4     Litigation.

There is no Action or Order pending or, to the knowledge of Buyer, threatened in writing against Buyer, whether at law or equity, whether civil or criminal in nature, or by or before any arbitration or Governmental Authority, that would affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.5     Brokers or Finders.

Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the Transactions for which Seller is or will become liable.

6.6     "AS IS" Transaction.

BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE 5 ABOVE, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH

RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS INCLUDING EXPENSES TO BE INCURRED IN CONNECTION WITH THE ACQUIRED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY COMPRISING A PART OF THE ACQUIRED ASSETS OR THAT IS THE SUBJECT OF ANY OTHER ASSUMED LEASE OR DESIGNATED CONTRACT TO BE ASSUMED BY BUYER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY LEASED REAL PROPERTY OR IMPROVEMENTS THAT ARE THE SUBJECT OF ANY REAL PROPERTY LEASE TO BE ASSUMED BY BUYER AT THE CLOSING, THE ZONING OF ANY SUCH LEASED REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE ACQUIRED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF PROPERTY, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE ACQUIRED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE ACQUIRED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ACQUIRED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH BUYER'S ACQUISITION OF THE ACQUIRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE 5, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, BUYER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

## ARTICLE 7
### ACTIONS PRIOR TO THE CLOSING DATE

7.1     Access and Reports.

Subject to applicable Legal Requirements, during the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Agreement in accordance with the provisions of ARTICLE 11, Seller shall: (a) afford Buyer and its Representatives access upon reasonable notice to its employees (if applicable), customers, suppliers, properties, books, Contracts and records of Seller during normal business hours to the extent such access does not unreasonably interfere with the businesses of Seller, and furnish promptly to Buyer all information as may be reasonably requested concerning (i) the Acquired Assets or the Assumed Liabilities, (ii) any current (if applicable) or former employees or service providers, or (iii) the Business; (b) permit Buyer to make such reasonable inspections and copies as Buyer may require, in each case, during normal business hours to the extent such inspections and making of copies do not unreasonably interfere with the businesses of Seller; and (c) instruct the executive officers and senior business managers, employees (if applicable), counsel, auditors and financing advisors of Seller to cooperate with Buyer and its Representatives regarding the same. No investigation pursuant to this Section 7.1 or by Buyer or its Representatives at any time prior to or following the Execution Date shall affect or be deemed to modify any representation or warranty made by Seller herein. The Parties shall enter into a mutually acceptable common interest agreement with respect to information disclosed pursuant to this Section 7.1, which is subject to attorney-client privilege. Subject to applicable Legal Requirements, following the Closing Date and through and including the closing of the Bankruptcy Case, Buyer shall, and shall cause its

32

Affiliates, to provide Seller reasonable access to all information and access *mutatis mutandis* as provided in clauses (a) through (c) of this Section 7.1.

    7.2        Operations Prior to the Closing Date.

    Seller covenants and agrees that, except (i) as expressly contemplated by this Agreement, (ii) as disclosed in Section 7.2 of the Disclosure Schedules, (iii) with the prior written consent of Buyer (which consent shall not be unreasonably withheld or delayed), (iv) as otherwise required by Legal Requirements or the Bankruptcy Court (including any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code), (v) as occurring as a result of Seller being in bankruptcy under the Bankruptcy Code, or (vi) as and to the extent permitted in writing by the lenders under the DIP Term Sheet or a Transaction Document, after the Execution Date and prior to the Closing Date:

    (a)        Seller shall:

    (i)    carry on the Business in the Ordinary Course of Business and use commercially reasonable efforts to maintain, preserve and protect all of the Acquired Assets in the condition in which they exist on the Execution Date, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course of Business (subject to Seller's compliance with the terms of the DIP Term Sheet, including the Approved Budget contemplated thereby and the funding of loans contemplated thereby, in each case, in accordance with the terms of the DIP Term Sheet);

    (ii)    maintain its books, accounts and records in accordance with past custom and practice;

    (iii)    use commercially reasonable efforts to maintain its relationships with and preserve for the Business the goodwill of its key suppliers and customers;

    (iv)    (A) comply in all material respects with all Legal Requirements applicable to it or having jurisdiction over the Business or any Acquired Asset, (B) comply in all material respects with contractual obligations applicable to or binding upon it pursuant to Assigned Contracts, and (C) maintain in full force and effect all Permits and comply, in all material respects, with the terms of each such Permit;

    (v)    cause any of its current insurance policies with respect to the Acquired Assets not to be canceled or terminated or any of the coverage thereunder to lapse unless (A) simultaneously with such termination, cancellation or lapse, replacement policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies are in full force and effect, or (B) adequate provision therefor is not provided for in the Approved Budget;

    (vi)    use commercially reasonable efforts to maintain, preserve and protect in full force and effect the existence of all material Intellectual Property included in the Acquired Assets;

    (vii)  use commercially reasonable efforts not to take or agree to or commit to assist any other Person in taking any action that would reasonably be expected (A) to result in a failure of any of the conditions to the Closing, or (B) to impair the ability of Seller or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation; and

(b)        Seller shall not:

(i)        except for executory contracts and unexpired leases rejected by Seller pursuant to the Sale Order with the prior written consent of Buyer, assume, reject, assign, terminate, modify or amend any Assigned Contract or, except with respect to breaches that will be cured by the Sale Order or pursuant to Section 2.6(a), or take any action which violates, conflicts with or resulted in a breach of any provision of, or constitutes a default under, any Assigned Contract;

(ii)       (A) purchase or otherwise acquire any material properties or assets (tangible or intangible) or sell, lease, transfer or otherwise dispose of any Acquired Assets or otherwise remove any assets, or make any material changes to asset levels, mix, or valuation, except for purchases of materials and sales of Inventory in the Ordinary Course of Business and sales and dispositions of obsolete assets, or (B) remove any material Equipment or other material assets from the Real Property other than in the Ordinary Course of Business or with the prior written consent of Buyer;

(iii)      waive or release any claim or rights included in or related to the Acquired Assets or the Business with a value, individually or in the aggregate, in excess of $50,000 or revalued any of the Acquired Assets, except for downward adjustments to the value of Inventory in the Ordinary Course of Business;

(iv)      enter into any contractual relationship with any third party related to the Acquired Assets or the Business, other than (A) in the Ordinary Course of Business, (B) contractual relationships with professionals and advisors entered into in connection with the bankruptcy of Seller and the Transactions, (C) non-disclosure and confidentiality agreements entered into with potential bidders for all or a portion of Seller's assets, and (D) any agreements relating to movement of Inventory;

(v)       enter into or renew any Contract having a term of one year or greater or that may require Seller to incur potential liabilities of $50,000 or greater per year without the consent of Buyer and, to the extent required, the approval of the Bankruptcy Court in accordance with section 363(b) of the Bankruptcy Code;

(vi)      make any material commitments for capital expenditures;

(vii)     suffer any material damage or destruction to or loss of any material assets or properties whether or not covered by insurance;

(viii)    change in any way Seller's accounting methods, principles or practices other than required by changes in GAAP;

(ix)      enter into any commitment or transaction or series of commitments or transactions in respect of Indebtedness or paid, discharged or satisfied any claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), other than (i) the payment, discharge or satisfaction in the Ordinary Course of Business of Liabilities incurred in the Ordinary Course of Business, and (ii) the DIP Term Sheet and the financing transactions contemplated thereby;

(x)       allow any Permit held by Seller to terminate, expire or lapse to the extent that any fees required to be paid in connection with renewal are included in the funds available to Seller under the DIP Term Sheet;

34

(xi)    (A) hire or engage any employees, independent contractors, consultants, or other service providers; (B) enter into or adopt any new severance pay, termination pay, deferred compensation, bonus, or other employee benefit plan with respect to any current (if applicable) or former employee or service provider that would be a Benefit Plan if it existed on the Execution Date (including any employment agreement, consulting agreement, severance agreement, change in control agreement, or transaction or retention bonus agreements); or (C) enter into, amend, extend, terminate or negotiate any Collective Bargaining Agreement, or recognize or certify any Union as the bargaining representative of any employees of Seller (if applicable), except, in the case of each of clauses (A) through (C), as required by applicable Legal Requirements or the terms of any Benefit Plan, as in effect on the Execution Date; or

(xii)    agree or commit to do any of the foregoing.

7.3    Governmental Approvals; Cooperation.

(a)    Seller and Buyer shall use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary to consummate and make effective, in the most expeditious manner practicable, the Transactions, including (i) taking all commercially reasonable acts necessary to cause the conditions precedent set forth in ARTICLE 9 and ARTICLE 10 to be satisfied, (ii) obtaining, at the earliest practicable date, all necessary Governmental Authorizations and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and taking all commercially reasonable steps as may be necessary to avoid any Action by any Governmental Authority, (iii) defending any Actions challenging this Agreement or the consummation of the Transactions, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed, and (iv) executing and delivering any additional instruments necessary to consummate the Transactions and to fully carry out the purposes of this Agreement.

(b)    Buyer and Seller shall take all commercially reasonable actions and do, or cause to be done, all commercially reasonable things necessary under the applicable Legal Requirements with the appropriate Governmental Authorities to put in place, to transfer, to amend, or to acquire all Transferred Permits that are necessary for the operation and conduct of the Acquired Assets by or on the Closing Date, unless the applicable Legal Requirements regarding such a Permit require certain actions to be taken upon or after Closing, and, in that event, Buyer and Seller shall take all commercially reasonable actions and do, or cause to be done, all commercially reasonable things necessary or desirable under the applicable Legal Requirements with the appropriate Governmental Authorities which can only be taken or done after Closing to put in place, transfer, amend or acquire such remaining Permits as promptly as reasonably practicable after the Closing. The fees and expenses paid to Governmental Authorities, in each case, as directed by Buyer and as necessary to put in place, transfer, amend or acquire all Transferred Permits that are necessary for the operation and conduct of the Acquired Assets shall be provided for in the Approved Budget and paid in accordance with the DIP Term Sheet (such fees and expenses, the "Transferred Permit Fees"), and Seller shall not be required to pay any Transferred Permit Fees following the Closing.

(c)    Seller and Buyer (i) shall to the extent legally permitted promptly inform each other of any communication from any Governmental Authority concerning this

Agreement, the Transactions, and any filing, notification or request for approval, and (ii) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine). In addition, none of the Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the Transactions, unless, to the extent legally permitted, such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate thereat, in each case, to the maximum extent practicable. Subject to restrictions under any Legal Requirements, each of Buyer and Seller shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the Transactions (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the Business) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the Transactions and any such filing, notification or request for approval.

     7.4         <u>Bankruptcy Court Matters</u>.

         (a)       <u>Sale Milestones</u>. From and after the Execution Date and until the Closing Date, subject, in each case, to the terms of the Bidding Procedures Order, Seller agrees:

         (i)       To file a motion in form and substance reasonably acceptable to Buyer seeking approval of the bidding and sale procedures and designating Buyer and this Agreement as the Stalking Horse Purchaser and the Stalking Horse Agreement (the "<u>Bidding Procedures Motion</u>") for the Transactions within three (3) Business Days after the Petition Date.

         (ii)       To obtain a hearing to approve the Bidding Procedures Motion on or before thirty-five (35) calendar days following the Petition Date.

         (iii)       That no later than thirty-five (35) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order with respect to the bidding procedures (the "<u>Bidding Procedures Order</u>").

         (iv)       That if multiple Qualified Bids are submitted prior to the Bid Deadline (as defined in the Bidding Procedures Order), commence the Auction on or before eighty (80) days after the Petition Date, subject to the Bidding Procedures Order.

         (v)       To obtain a Sale Hearing before the Bankruptcy Court to approve the Transactions to be held on or before ninety (90) days following the Petition Date and the Sale Order shall have been entered no later than ninety (90) days following the Petition Date.

         (vi)       The Closing shall occur no later than 120 days after the Petition Date.

(b)        Buyer and Seller acknowledge that this Agreement and the sale of the Acquired Assets and assumption and assignment of the Assigned Contracts are subject to Bankruptcy Court approval. Buyer and Seller acknowledge that (i) to obtain such approval and to satisfy Seller's fiduciary duties to all applicable stakeholders in accordance with applicable Legal Requirements, Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Acquired Assets, and that such demonstration shall include giving notice of the Transactions to creditors and other interested parties, including as may be ordered by the Bankruptcy Court and, if necessary, conducting the Auction, and (ii) Buyer must provide adequate assurance of future performance as required under the Bankruptcy Code with respect to each Assigned Contract.

(c)        Buyer agrees and acknowledges that Seller, including through its representatives, are and may continue soliciting and responding to inquiries, proposals or offers from third parties for all or any part of the Acquired Assets, as contemplated by the Bidding Procedures and such actions as contemplated by the terms of the Bidding Procedures shall not be a breach or violation of this Agreement.

7.5        <u>Notice of Developments</u>.

Seller shall promptly notify Buyer of, and furnish Buyer with, any information it may reasonably request with respect to any event that would reasonably be expected to cause any of the conditions set forth in <u>ARTICLE 9</u> not to be fulfilled by the Outside Date. Notwithstanding anything to the contrary in this <u>Section 7.5</u>, no schedule, notice, information, or updated item delivered pursuant to this <u>Section 7.5</u> shall be deemed to supplement, modify or update any Schedule or cure any breach of any such representation or warranty, in each case, for the purpose of determining whether any of the conditions to Closing set forth in <u>ARTICLE 9</u> have been satisfied or fulfilled.

7.6        <u>Transition of Business</u>.

Seller shall use commercially reasonable efforts to assist Buyer in accomplishing the acquisition of the Acquired Assets of the Business from Seller by Buyer as contemplated herein. Following the Closing, Seller, at no cost or other exposure to Seller, shall cooperate with Buyer in its efforts to continue and maintain for the benefit of Buyer those business and customer relationships of Seller existing prior to the Closing and relating to the Business, including relationships with lessors, current (if any) or former employees, regulatory authorities, licensors, customers, suppliers and others. Seller shall refer to Buyer all inquiries relating to the Acquired Assets. Seller shall not take any action that diminishes, or would reasonably be expected to diminish, the value of the Acquired Assets after the Closing or that would interfere with the business of Buyer to be engaged in after the Closing, including disparaging the name or business of Buyer.

7.7        <u>Sale Free and Clear</u>.

The Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising Liabilities and Liens (including all successor liability) of, against or created by Seller or its bankruptcy estate shall, to the fullest extent permitted by sections 363 and 365 of the Bankruptcy Code, be fully released from and with respect to the Acquired Assets. On the Closing Date, the Acquired Assets shall be transferred to Buyer free and clear of any and all Liabilities and Liens (including all successor liability), other than the Assumed

Liens and the Assumed Liabilities, to the fullest extent permitted by sections 363 and 365 of the Bankruptcy Code. The Sale Order shall authorize Buyer's exercise of the Credit Bid for any obligations arising under the DIP Term Sheet.

## ARTICLE 8
### ADDITIONAL AGREEMENTS

8.1     Taxes.

Any Transfer Tax payable in connection with the sale, conveyance, assignments, transfers and deliveries to be made to Buyer hereunder shall be borne by Buyer. Seller and Buyer shall use commercially reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes. Buyer and Seller agree to timely sign and deliver (or cause to be timely signed and delivered) such certificates or forms as may be reasonably necessary or appropriate for establishing, and shall otherwise reasonably cooperate to establish, any available exemption from or reduction of any such Transfer Taxes. The party required by applicable Legal Requirements to prepare and file any Tax Returns in respect of such Transfer Taxes shall prepare and file such Tax Returns and the other party (or parties) shall cooperate in full in connection with the preparation of such Tax Returns.

8.2     Payments Received.

Seller and Buyer agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using commercially reasonable efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which belongs to the other and will account to the other for all such receipts.

8.3     Assigned Contracts: Adequate Assurance and Performance.

Buyer shall use commercially reasonable efforts to provide adequate assurance of the future performance by Buyer of each Assigned Contract as required under section 365 of the Bankruptcy Code. Buyer and Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts pursuant to section 365 of the Bankruptcy Code, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's and Seller's representatives available to testify before the Bankruptcy Court.

8.4     Post-Closing Books and Records and Personnel.

From and after the Closing Date, each Party shall provide the other Parties (and their respective Representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, to the books, records, systems and any employees of the other Parties so as to enable Buyer and Seller to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, and to prosecute and defend legal Actions or for other like purposes, including Claims, objections and resolutions, and with respect to Seller, to wind-up its bankruptcy estate, which shall include the cooperation of the Parties in taking whatever actions are reasonably necessary to effect such winding up. If any party desires to dispose of any such

38

records, such Party shall, thirty (30) days prior to such disposal, provide the other Party with a reasonable opportunity to remove such records to be disposed of at the removing Party's expense.

8.5     Casualty Loss.

Notwithstanding any provision in this Agreement to the contrary, if, before the Closing, all or any portion of the Acquired Assets is (a) condemned or taken by eminent domain, or (b) is damaged or destroyed by fire, flood or other casualty, Seller shall notify Buyer promptly in writing of such fact, and in the case of (i) condemnation or taking, Seller shall assign or pay, as the case may be, any proceeds thereof to Buyer at the Closing, and (ii) fire, flood or other casualty, Seller shall assign the insurance proceeds therefrom to Buyer at Closing. Notwithstanding the foregoing, the provisions of this Section 8.5 shall not in any way modify Buyer's other rights under this Agreement, including any applicable right to terminate the Agreement if any condemnation, taking, damage or other destruction results or would reasonably be expected to result in a Material Adverse Effect.

8.6     Name Change.

Promptly following the Closing and in any event within ninety (90) Business Days after the Closing Date, Seller shall discontinue the use of its current name (and any other trade names or "d/b/a" names currently utilized by Seller) and file or cause to be filed all documents, including amendments to Seller's organizational documents, and shall take all other steps, that are necessary to change the name of Seller to a name that does not contain the terms "Norcold", or any variation on "Norcold".  Further, Seller shall (i) except in connection with administration of the Bankruptcy Case, cease all use of the "Norcold" name and any confusingly similar variations promptly following Closing; (ii) execute and deliver all instruments and take all actions reasonably requested by Buyer to retire, abandon, cancel, or otherwise discontinue the "Norcold" Trademarks and trade names (or to reflect Buyer as owner of record prior to any retirement or cancellation), including any filings with the USPTO and foreign trademark offices; and (iii) not oppose, challenge, or interfere with any action by Buyer to retire, abandon, cancel, or otherwise discontinue the "Norcold" Trademarks or trade names.

8.7     No Successor Liability.

The Parties intend that upon the Closing, Buyer shall not be deemed to (a) be the successor of or successor employer (within the meaning of such term under any Legal Requirement and applicable rules, regulations or legal principles thereunder) to Seller or any of its Affiliates, including with respect to any current (if applicable) or former employees, contractors or consultants, (b) have, *de facto*, or otherwise, merged with or into Seller, (c) be a mere continuation or substantial continuation of Seller or the enterprise(s) of Seller, or (d) except in each case as included in the Assumed Liabilities, be liable for any acts or omissions of Seller in the conduct of the Business or arising under or related to the Acquired Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement or otherwise required by applicable law, the Parties intend that Buyer shall not be liable for any Liens (other than Assumed Liabilities and Assumed Liens) against Seller or any of its predecessors or Affiliates, and Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Acquired Assets or any Liabilities of Seller arising prior to the Closing Date. The Parties agree that the provisions substantially in the form of this Section 8.7 shall be reflected in the Sale Order.

## ARTICLE 9
### CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the Transactions are subject to fulfillment, at the Closing, of each of the following conditions, any one or more of which may be waived by Buyer, in its sole and absolute discretion:

9.1     Accuracy of Representations.

The representations and warranties of Seller set forth in (a) ARTICLE 5 (other than the representations and warranties set forth in Section 5.1 and Section 5.2,) shall be true and correct as of the Closing Date as though such representations and warranties had been made on and as of the Closing (provided that representations and warranties which are confined to a specified date shall speak only as of such date), except for those breaches, if any, of such representations and warranties that in the aggregate have not had and would not reasonably be expected to have a Material Adverse Effect, and (b) Section 5.1 and Section 5.2 shall be true and correct in all respects as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing.

9.2     Seller's Performance.

The covenants and agreements that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with, in all material respects.

9.3     No Order.

No Governmental Authority shall have enacted, issued, promulgated, decreed or entered any final, non-appealable Order, which is in effect and has the effect of restraining or preventing the consummation of or imposing material modifications on the Transactions.

9.4     Governmental Authorizations; Consents.

All material Permits and consents set forth on Section 9.4 of the Disclosure Schedules shall have been made or obtained.

9.5     Seller's Deliveries.

Each of the deliveries required to be made to Seller pursuant to Section 4.3 shall have been so delivered.

9.6     Sale Order.

The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall have not been stayed, reversed, modified or amended and be in effect on the Closing Date.

9.7     Assigned Contracts.

The Bankruptcy Court shall have approved and authorized the assumption and assignment of each Assigned Contract, except as would not have a material effect on the Business from and after the Closing and except for any Contracts that are removed from Section 2.6(a) of the Disclosure Schedules pursuant to the provisions of Section 2.6.

9.8     Material Adverse Effect.

Since the Execution Date, no Material Adverse Effect shall have occurred.

40

9.9        Event of Default.

No Event of Default shall have occurred under the DIP Order (a) which gives the secured parties thereunder a termination right, (b) as a result of which, the secured parties thereunder shall have accelerated the repayment obligations of Seller, and (c) which has not been waived.

9.10       Releases and Termination Statements.

Seller shall have delivered to Buyer releases and termination statements sufficient for Buyer to receive the Acquired Assets free and clear of any and all material Liens (other than Assumed Liens); provided, however, that releases shall not be required with respect to Liens that are both (a) released by the Sale Order, and (b) not required to be released at Closing pursuant to releases and termination statements in connection with a financing or debt facility obtained by Buyer.

9.11       Confirmation Order

The Bankruptcy Court shall have entered the Confirmation Order in full force and effect as a Final Order and there shall have been no modification or stay of the Confirmation Order or entry of any other order prohibiting the transactions contemplated by the Plan from being consummated.

## ARTICLE 10
### CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE

The obligations of Seller to consummate the Transactions are subject to fulfillment, at the Closing, of each of the following conditions, any one or more of which may be waived by Seller, in its sole and absolute discretion:

10.1       Accuracy of Representations.

The representations and warranties of Buyer (a) set forth in ARTICLE 6 (other than the representations and warranties set forth in Section 6.1 and Section 6.2) shall be true and correct as of the Closing Date as though such representations and warranties had been made on and as of the Closing (provided that representations and warranties which are confined to a specified date shall speak only as of such date), except for those breaches, if any, of such representations and warranties that in the aggregate have not had and would not reasonably be expected to have a Material Adverse Effect, and (b) set forth in Section 6.1 and Section 6.2 shall be true and correct in all respects as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing.

10.2       Sale Order in Effect.

The Bankruptcy Court shall have entered the Sale Order.

10.3       Buyer's Performance.

The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with, in all material respects.

41

10.4     No Order.

No Governmental Authority shall have enacted, issued, promulgated or entered any final, non-appealable Order, which is in effect and has the effect of preventing the consummation of the Transactions.

10.5     Buyer's Deliveries.

Each of the deliveries required to be made to Buyer pursuant to Section 4.2 shall have been so delivered.

# ARTICLE 11
## TERMINATION

11.1     Termination Events.

Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing only as follows:

(a)     by mutual written consent of Seller and Buyer;

(b)     by either Seller or Buyer if the Closing shall not have occurred by February 12, 2026 or such later date as chosen by Buyer, in its sole and absolute discretion (the "Outside Date"); provided, however, that Buyer must notify Seller in writing on or prior to February 11, 2026 of any extension of the Outside Date to later than February 12, 2026; provided, further, that the right to terminate this Agreement under this Section 11.1(b) shall not be available to any Party whose willful failure to fulfill any of its obligations under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the Outside Date;

(c)     by Buyer:

(i)     if any of the events set forth in clauses (a) and (b) of Section 7.4 shall not have occurred by the respective dates set forth therein;

(ii)     if the Bankruptcy Court enters an Order dismissing or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by Seller under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Case or appointing a trustee in the Bankruptcy Case or appointing a responsible officer or an examiner with enlarged powers relating to the operation of Seller's businesses (beyond those set forth in section 1106(a)(3) or (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code, or such an order of dismissal, conversion or appointment is entered for any reason and is not be reversed or vacated within fourteen (14) days after the entry thereof or Seller seeks such an Order;

(iii)     in the event of any material breach of, or material failure to perform, any agreements, covenants, representations or warranties contained herein or in the Sale Order, which breach or failure to perform (A) would result in Seller being unable to satisfy a condition set forth in Section 9.1 or Section 9.2 by the then-applicable Outside Date, and (B) is not capable of being cured or, if capable of being cured, is not cured within fifteen (15) Business Days after Buyer notifies Seller of such breach;

(iv)     if the Bidding Procedures Order has been amended or rescinded or has been modified in any respect that is detrimental to Buyer, and the Order revoking,

42

rescinding, or so modifying the Bidding Procedures Order shall not be reversed or vacated within fourteen (14) days after the entry thereof;

(v) if the Sale Order has been amended or rescinded or has been modified in any respect without the prior written consent of Buyer (which shall be in its sole and absolute discretion to provide), and the Order revoking, rescinding, or so modifying the Sale Order shall not be reversed or vacated within fourteen (14) days after the entry thereof;

(vi) if, at the end of the Auction contemplated by the Bidding Procedures, Buyer is not determined by Seller to be the Successful Bidder or the Backup Bidder or if Seller closes on a transaction with a Successful Bidder other than Buyer;

(vii) if a Governmental Authority issues a final, non-appealable ruling or Order permanently restraining, enjoining or otherwise prohibiting the Transactions;

(viii) if any Event of Default shall have occurred and not been waived, subject to any applicable cure period, or the lenders' obligations under the DIP Order are terminated;

(ix) if Seller has sold, leased, transferred or otherwise disposed of any Acquired Assets (or assets that would be Acquired Assets but for such sale, lease, transfer or disposition), in each case, except for (A) purchases of materials and sales of Inventory in the Ordinary Course of Business and sales and dispositions of obsolete assets, and (B) sales, leases, transfers or dispositions with Buyer's prior written consent; or

(x) if the Bankruptcy Court enters any Order that (A) requires any Excluded Cause of Action to be treated as an Acquired Asset or as an Assumed Liability; (B) requires the assumption of any Assigned Contract that could give rise to an Excluded Cause of Action; or (C) otherwise has the effect that any Excluded Cause of Action or any liability arising therefrom becomes an Assumed Liability; and

(d) by Seller:

(i) in the event of any breach of, or failure to perform, any agreements, covenants, representations or warranties contained herein, which breach or failure to perform (A) would result in Buyer being unable to satisfy a condition set forth in Section 10.1 or Section 10.3, and (B) is not capable of being cured or, if capable of being cured, is not cured within ten (10) Business Days after Seller notifies Buyer of such breach;

(ii) if, in accordance with the Bidding Procedures, Buyer is not determined by Seller to be the Successful Bidder or the Backup Bidder and Seller have entered into any material agreement with any such Successful Bidder or Backup Bidder; or

(iii) if the board of managers or similar governing body of Seller determines that terminating the Transactions or terminating this Agreement is required to comply with applicable Legal Requirements or such body's fiduciary duties under applicable Legal Requirements.

Each condition set forth in this Section 11.1, pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition. If more than one of the termination conditions set forth in Section 11.1 are applicable, the applicable party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated. The Parties acknowledge and agree that no notice of termination or extension of the

43

Outside Date provided pursuant to this <u>Section 11.1</u> shall become effective until two (2) days after the delivery of such notice to the other Parties, and only if such notice shall not have been withdrawn during such two (2) day period or otherwise become invalid.

11.2    <u>Effect of Termination</u>.

If this Agreement is terminated by Buyer or Seller pursuant to this <u>ARTICLE 11</u>, it shall become null and void and have no effect and all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party except (i) nothing herein shall relieve any Party from Liability for any breach of this Agreement occurring prior to such termination, and (ii) the provisions of <u>Section 7.5</u>, and this <u>Section 11.2</u> (and, to the extent applicable to the interpretation or enforcement of such provisions, <u>ARTICLE 1</u> and <u>ARTICLE 12</u>), shall expressly survive the termination of this Agreement.

## ARTICLE 12
### GENERAL PROVISIONS

12.1    <u>Survival</u>.

All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate, including any Actions for damages in respect of any breach thereof.

12.2    <u>Confidentiality</u>.

Following the Closing, Seller agrees to, and to cause its Affiliates to, treat and hold as confidential, and not use or disclose all or any of the information concerning the Business, the Acquired Assets, the negotiation or existence and terms of this Agreement or the business affairs of Buyer except (a) disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto, and (b) disclosures permitted under this Agreement.

12.3    <u>Public Announcements</u>.

Unless otherwise required by applicable Legal Requirement or by obligations of Buyer or Seller or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Buyer and Seller shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the Transactions or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld or delayed).

12.4    <u>Notices</u>.

All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or sent by overnight courier or, to the extent listed below, email transmission:

44

(a)      If to Seller, then to:

> Norcold, LLC
> c/o Alvarez & Marsal North America LLC
> 600 Brickell Avenue, Suite 2950
> Miami, FL 33131
> Attn:     Richard Wu
> Email:    rwu@alvarezandmarsal.com

> with a copy (which shall not constitute notice) to:

> Young Conaway Stargatt & Taylor, LLP
> Rodney Square
> 1000 N. King Street
> Wilmington, DE 19801
> Attn:     Matthew B. Lunn
>           Craig D. Grear
> Email:    mlunn@ycst.com
>           cgrear@ycst.com

(b)      If to Buyer:

> Dave Carter & Associates, Inc.
> 3530 S.W. 7th St.
> Ocala, FL 34474
> Attn:     Stéphane Pascal Cordeille
> Email:    scordeille@thetford.eu

> with a copy (which shall not constitute notice) to:

> Ropes & Gray LLP
> 1211 Avenue of the Americas
> New York, NY 10036
> Attention: Patrick S. Dorime
>            Chris L. Dickerson
> Email:    Patrick.Dorime@ropesgray.com
>           Chris.Dickerson@ropesgray.com

or to such other person or address as any party shall specify by notice in writing to the other party. All such notices, requests, demands, waivers and communications shall be deemed to have been received on the date on which so personally-delivered or emailed (with confirmation of transmission) or delivered by overnight courier.

12.5     Waiver.

Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by Legal

45

Requirements, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

12.6      Entire Agreement; Amendment.

This Agreement (including the Disclosure Schedules and the Exhibits) and the other Transaction Documents supersede all prior agreements between Buyer and Seller with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer and Seller with respect to their subject matter. This Agreement may not be amended, modified or supplemented except by a written agreement executed by each of the Parties.

12.7      Assignment.

This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party); provided, however, that Buyer shall be permitted to assign all or part of its rights or obligations hereunder to one or more Buyer Designees without the prior consent of Seller as provided in Section 4.2(b).

12.8      Severability.

The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

12.9      Expenses.

Except as otherwise expressly provided in this Agreement, including Section 11.2, whether or not the Transactions are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the Transactions. Any and all fees required by any Governmental Authority or any Person to obtain or for the transfer of a Permit shall be the sole responsibility of Buyer.

12.10      Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)      Except to the extent the provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto.

(b)      Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be

connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action; provided, however, that, if the Bankruptcy Case is closed, all Actions arising out of or relating to this Agreement shall be heard and determined in a New York state court or a federal court sitting in the Southern District of the State of New York, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action. The Parties consent to service of process by mail (in accordance with Section 12.4) or any other manner permitted by law.

(c)     THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLER, BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

12.11     Counterparts.

This Agreement and any amendment hereto may be executed in two or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com), or other transmission method and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective and binding on each Party for all purposes.

12.12     Parties in Interest; No Third Party Beneficiaries; No Amendment.

The Transaction Documents (a) shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns, and (b) are for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

12.13     Remedies.

Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit Seller or Buyer in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

12.14     Specific Performance for Post-Closing Covenants.

Solely with respect to the Parties' respective covenants under this Agreement that survive the Closing, and solely to the extent to be performed after the Closing, (a) each Party recognizes that if such Party breaches or refuses to perform any such covenant, monetary damages alone would not be adequate to compensate the non-breaching Party or Parties for their injuries, (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of the terms of such covenants, (c) if any Action is brought by the non-breaching Party or Parties to enforce such covenants, the Party in

breach shall waive the defense that there is an adequate remedy at law, (d) each Party agrees to waive any requirement for the security or posting of any bond in connection with any Action seeking specific performance of such covenants, and (e) each Party agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants. Notwithstanding any other provision of this Agreement to the contrary, no Party shall be entitled to any equitable remedy, including an injunction or order for specific performance, to enforce any provision of this Agreement prior to the Closing.

12.15    No Exemplary, Special, Punitive Damages.

NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY EXEMPLARY, SPECIAL, OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, COST OF CAPITAL, OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

12.16    Non-Recourse.

No past, present or future director, officer, employee, incorporator, member, partner or equityholder of the Parties will have any liability for any obligations or liabilities of Seller or Buyer, as applicable, under this Agreement, or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein. Other than the parties hereto, no party shall have any liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of any party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any action or proceeding based on, in respect of, or by reason of, the transactions contemplated hereby or thereby (including breach, termination or failure to consummate such transactions), in each case, whether based on contract, tort, fraud, strict liability, other Legal Requirements or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a party hereto or another Person or otherwise.

12.17    Release.

Effective as of the Closing and subject to consummation of the Transactions, and except as otherwise expressly provided herein or in the Sale Order, Seller, on behalf of itself, its bankruptcy estate, successors, assigns and any Person claiming by, through, or on behalf of any of the foregoing (collectively, the "Releasing Seller Parties"), hereby fully, finally, irrevocably, and unconditionally releases, waives, acquits, and forever discharges Buyer and each of its current and former officers, directors, managers, employees, agents, attorneys, accountants, consultants, advisors, representatives, and respective successors and assigns thereof, solely in their capacities as such (collectively, the "Released Buyer Parties"), from any and all Actions, Liabilities, and obligations of any kind, nature or description, whether known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, pending or threatened, contingent or fixed, liquidated or unliquidated, matured or unmatured, suspected or unsuspected, at law or in equity, upon contract tort or under any state or federal law or otherwise, which any Releasing Seller Party

has or may have against any Released Buyer Party arising on or prior to the Closing Date and relating to or arising out of (a) the Acquired Assets, (b) the Assumed Liabilities, or (c) the Transactions or the negotiation thereof.  The foregoing release shall not apply unless and until the Closing occurs and shall not affect any rights of the Releasing Seller Parties (i) under the Transaction Documents, or (ii) to enforce Buyer's obligations under this Agreement.

[*Signature pages follow.*]

49

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, as of the Execution Date.

<u>**SELLER**</u>:

NORCOLD, LLC

By: _____
      Name:    Richard Wu
      Title:     Chief Restructuring Officer

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, as of the Execution Date.

**BUYER**:

DAVE & CARTER ASSOCIATES, INC.

By: _____
    Name:    Stéphane Pascal Cordeille
    Title:     Chief Executive Officer

*[Signature Page to Asset Purchase Agreement]*